NEW YORK TELEPHONE CO. et al. v. NEW YORK
STATE DEPARTMENT OF LABOR et al.

No. 77–961. Argued October 30, 1978—Decided March 21, 1979

520

521

STEVENS, J., announced the Court's judgment and delivered an opinion, in which WHITE and REHNQUIST, JJ., joined. BRENNAN, J., filed an opinion concurring in the result, *post*, p. 546. BLACKMUN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 547. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and STEWART, J., joined, *post*, p. 551.

*David D. Benetar* argued the cause for petitioners. With him on the brief were *Stanley Schair, Mark H. Leeds, George E. Ashley, William P. Witman,* and *Laurel J. McKee.*

*Maria L. Marcus,* Special Assistant Attorney General of New York, argued the cause for respondents. With her on the brief were *Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, *Kathleen H. Casey,* Assistant Attorney General, *Donald Sticklor,* Deputy Assistant Attorney General, and *Nicholas G. Garaufis,* Special Assistant Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed by *Vincent J. Apruz-*

MR. JUSTICE STEVENS announced the judgment of the Court and delivered an opinion, in which MR. JUSTICE WHITE and MR. JUSTICE REHNQUIST joined.

The question presented is whether the National Labor Relations Act, as amended, implicitly prohibits the State of New York from paying unemployment compensation to strikers.

Communication Workers of America, AFL–CIO (CWA), represents about 70% of the nonmanagement employees of companies affiliated with the Bell Telephone Co. In June 1971, when contract negotiations had reached an impasse, CWA recommended a nationwide strike. The strike commenced on July 14, 1971, and, for most workers, lasted only a week. In New York, however, the 38,000 CWA members employed by petitioners remained on strike for seven months.[1]

_zese, Lawrence B. Kraus,_ and _Stephen A. Bokat_ for the Chamber of Commerce of the United States; by _Lawrence M. Cohen, Jeffrey S. Goldman, Jared H. Jossem, Brynn Aurelius,_ and _Anthony G. Sousa_ for Dow Chemical Co. et al.; by _Eugene D. Ulterino_ for Rochester Telephone Corp. et al.; and by _Hugh L. Reilly_ for Stephen R. Havas et al.

Briefs of _amici curiae_ urging affirmance were filed by _Solicitor General McCree, John S. Irving, Carl L. Taylor, Norton J. Come,_ and _Linda Sher_ for the United States; by _J. Albert Woll_ and _Laurence Gold_ for the American Federation of Labor and Congress of Industrial Organizations et al.; by _Michael Krinsky, Thomas Kennedy,_ and _Jerome Tauber_ for the National Lawyers Guild; and by _Frederick L. Edwards_ for the Center on National Labor Policy.

[1] Petitioners—New York Telephone Co., American Telephone & Telegraph Co. Long Lines Department, Western Electric Co., and Empire City Subway Co.—are the four Bell Telephone Co. affiliates with facilities and employees in the State of New York.

The goal of the New York strike was to disassociate the New York units of the CWA from the nationally settled-upon contract and to dislodge petitioners from the "pattern" bargaining format long used by Bell affiliates. Under that format, management and International CWA officials would select two Bell affiliates with early contract expiration dates and would attempt to reach a settlement at both, which would then be used as the basis for the contracts at all Bell units around the country. In order to "break the pattern," the New York CWA units refused to ratify the pattern contract

New York's unemployment insurance law normally authorizes the payment of benefits after approximately one week of unemployment.[2] If a claimant's loss of employment is caused by "a strike, lockout, or other industrial controversy in the establishment in which he was employed," § 592 (1) of the law suspends the payment of benefits for an additional 7-week period.[3] In 1971, the maximum weekly benefit of $75 was payable to an employee whose base salary was at least $149 per week.

After the 8-week waiting period, petitioners' striking employees began to collect unemployment compensation. During the ensuing five months more than $49 million in benefits were paid to about 33,000 striking employees at an average rate of somewhat less than $75 per week. Because New York's unemployment insurance system is financed primarily by employer contributions based on the benefits paid

agreed upon by the International CWA and the pattern-setting affiliates during the week-long national strike in July 1971, and most members of the New York units remained on strike. Although the International originally opposed the continuation of the strike, it eventually lent its support. The strike was settled when petitioners agreed to a modest, but precedentially significant, increase in wage benefits over the national pattern. 434 F. Supp. 810, 812–814, and n. 3 (SDNY 1977).

[2] N. Y. Lab. Law § 590 (7) (McKinney Supp. 1978–1979). Eligibility for benefits turns on the recipient's total unemployment and his capability and readiness, but inability, to gain work in his "usual employment or in any other for which he is reasonably fitted by training and experience." §§ 591 (1), 591 (2).

[3] Section 592 (McKinney 1977) is entitled "Suspension of accumulation of benefit rights." Subsection (1) of that section, entitled "Industrial controversy," provides:

"The accumulation of benefit rights by a claimant shall be suspended during a period of seven consecutive weeks beginning with the day after he lost his employment because of a strike, lockout, or other industrial controversy in the establishment in which he was employed, except that benefit rights may be accumulated before the expiration of such seven weeks beginning with the day after such strike, lockout, or other industrial controversy was terminated."

to former employees of each employer in past years, a substantial part of the cost of these benefits was ultimately imposed on petitioners.[4]

---

[4] In order to explain why the entire cost was not borne by the companies, it is necessary to describe in some detail the rather complicated method used by New York to compute employer contributions. The State maintains an "unemployment insurance fund" made up of all moneys available for distribution to unemployed persons. § 550 (McKinney 1977). A separate "unemployment administration fund" is maintained to finance the administration of the unemployment law. § 551.

The unemployment fund is divided into various "accounts." The "general account" is primarily made up of moneys derived from federal contributions under 42 U. S. C. § 1103 (a part of Title IX of the Social Security Act), the earnings on all moneys in the fund, and, occasionally, employer contributions. N. Y. Lab. Law §§ 577 (1)(a), 577 (2) (McKinney 1977 and Supp. 1978–1979). The money in the general account may be transferred to the administrative fund (the federally contributed money being specially set aside for this purpose, § 550 (3)) or used to finance refunds, the payment of benefits to certain employees who move into New York from out of state, and claims against "employer accounts" that show negative balances. §§ 577 (1)(b), 581 (1)(e) (McKinney 1977 and Supp. 1978–1979).

Employer accounts, which make up the rest of the unemployment fund, contain all of the contributions from individual employers. The rate of contributions—above a minimum level charged to all employers—is generally based on the employer's "experience rating," i. e., the amount of unemployment benefits attributable to employees previously in his employ. §§ 570 (1), 581 (McKinney 1977 and Supp. 1978–1979).

Employees are generally eligible for 156 "effective days" of benefits, which usually amount to about eight calendar months. §§ 523, 590 (4), 601 (McKinney 1977 and Supp. 1978–1979). But not all of those benefits are attributed to the account, and thus reflected in the experience rating, of the employer who last employed the claimant. First, the account is only charged with four days of benefits for every five days during which the claimant was employed by that employer. If this computation exhausts the claimant's tenure with a given employer, the benefits are then charged to the account of the recipient's next most recent employer, or to the general account when the class of former employers of the recipient is exhausted. § 581 (1)(e) (McKinney Supp. 1978–1979). Second, special provisions limit the liability of employers for claimants who previously

Petitioners brought suit in the United States District Court for the Southern District of New York against the state officials responsible for the administration of the unemployment compensation fund. They sought a declaration that the New York statute authorizing the payment of benefits to strikers conflicts with federal law and is therefore invalid, an injunction against the enforcement of § 592 (1), and an award recouping the increased taxes paid in consequence of the disbursement of funds to their striking employees. After an 8-day trial, the District Court granted the requested relief. 434 F. Supp. 810 (1977).

The District Court concluded that the availability of unemployment compensation is a substantial factor in the worker's

---

held down two jobs or were only employed part time. *Ibid.* Third, any benefits reimbursed by the Federal Government are not debited to employer accounts. *Ibid.* Finally, and most importantly, only one-half of the last 52 effective days of benefits available to a claimant are charged to the employer's account; the other half is debited to the general account, and that account is credited with amounts received from the Federal Government pursuant to the Federal-State Extended Unemployment Compensation Act, 26 U. S. C. § 3304. N. Y. Lab. Law § 601 (4) (McKinney Supp. 1978–1979). Hence, it is not by any means accurate to state that the struck employer is charged with all of the unemployment benefits paid to striking employees. The Federal Government, and the class of New York employers as a whole, may also pay significant amounts of the benefits, as well as of the costs of administering the program.

In this case, for example, the payments to strikers commenced at a time when the unemployment account of petitioner New York Telephone Co. (TELCO) had credits of about $40 million. During the strike, about $43 million in benefits were paid to TELCO employees. Yet, TELCO's account was not completely depleted during the period, apparently because other accounts were debited with approximately $3 million in benefits paid to its workers.

Based on its unemployment benefits "experience" during the strike, TELCO's contributions to its unemployment account during the next two years were increased by about $16 million over what they would have been had no strike occurred. (The like figure for petitioners as a whole was just under $18 million.) See 434 F. Supp., at 813–814, and n. 4.

decision to remain on strike, and that in this case, as in others, it had a measurable impact on the progress of the strike.[5] The court held that the payment of such compensation by the State conflicted "with the policy of free collective bargaining established in the federal labor laws and is therefore invalid under the supremacy clause of the United States Constitution." [6] *Id.,* at 819.

The Court of Appeals for the Second Circuit reversed. It did not, however, question the District Court's finding that the New York statute "alters the balance in the collective bargaining relationship and therefore conflicts with the federal labor policy favoring the free play of economic forces in the collective bargaining process." 566 F. 2d 388, 390. The Court of Appeals noted that Congress has not expressly forbidden state unemployment compensation for strikers; the court inferred from the legislative history of the National

---

[5] "Notwithstanding the State's adamant position to the contrary, I regard it as a fundamental truism that the availability to, or expectation or receipt of a substantial weekly tax-free payment of money by, a striker is a substantial factor affecting his willingness to go on strike or, once on strike, to remain on strike, in the pursuit of desired goals. This being a truism, one therefore would expect to find confirmation of it everywhere. One does." *Id.,* at 813–814.

In the District Court's opinion, as well as in petitioners' briefs in this Court, the primary emphasis is on the impact of the availability of unemployment benefits on the striking *employee.* The District Court's economic-impact analysis finds further support, however, in the separate impact that the New York scheme has on the struck *employer,* whose unemployment insurance contribution rate will increase in rough proportion to the length of the 8-weeks-plus strike. But, as the District Court apparently recognized, under an economic-impact test it makes little difference—assuming the same amount of money is involved—whether the result of the unemployment scheme is simply to provide payments to striking workers, or simply to exact payments from struck employers, or some of both.

[6] The District Court regarded the State's interest in making the payments as not of sufficient consequence to be a factor in its determination. *Id.,* at 819.

Labor Relations Act,[7] and Title IX of the Social Security Act,[8] as well as from later developments, that the omission was deliberate. Accordingly, without questioning the premise that federal law generally requires that "State statutes which touch or concern labor relations should be neutral," the Court of Appeals concluded that "th[is] conflict is one which Congress has decided to tolerate." *Id.*, at 395.

The importance of the question led us to grant certiorari. 435 U. S. 941. We now affirm. Our decision is ultimately governed by our understanding of the intent of the Congress that enacted the National Labor Relations Act on July 5, 1935, and the Social Security Act on August 14 of the same year. Before discussing the relevant history of these statutes, however, we briefly summarize (1) the lines of pre-emption analysis that have limited the exercise of state power to regulate private conduct in the labor-management area and (2) the implications of our prior cases, both inside and outside the labor area, involving the distribution of public benefits to persons unemployed by reason of a labor dispute.

## I

The doctrine of labor law pre-emption concerns the extent to which Congress has placed implicit limits on "the permissible scope of state regulation of activity touching upon labor-management relations." *Sears, Roebuck & Co. v. Carpenters,* 436 U. S. 180, 187. Although this case involves the exploration of those limits in a somewhat novel setting, it soon becomes apparent that much of that doctrine is of limited relevance in the present context.

There is general agreement on the proposition that the "animating force" behind the doctrine is a recognition that the purposes of the federal statute would be defeated if state

---

[7] 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.*

[8] 49 Stat. 639, as amended and recodified as the Federal Unemployment Tax Act, 26 U. S. C. § 3301 *et seq.*, 42 U. S. C. § 501 *et seq.*, § 1101 *et seq.*

and federal courts were free, without limitation, to exercise jurisdiction over activities that are subject to regulation by the National Labor Relations Board. *Id.,* at 218 (BRENNAN, J., dissenting).[9] The overriding interest in a uniform, nationwide interpretation of the federal statute by the centralized expert agency created by Congress not only demands that the NLRB's primary jurisdiction be protected, it also forecloses overlapping state enforcement of the prohibitions in § 8 of the Act,[10] *Plankinton Packing Co.* v. *Wisconsin Employment Relations Board,* 338 U. S. 953, as well as state interference with the exercise of rights protected by § 7 of the Act.[11] *Automobile Workers* v. *Russell,* 356 U. S. 634, 644.[12] Con-

---

[9] "The animating force behind the doctrine of labor law pre-emption has been the recognition that nothing could more fully serve to defeat the purposes of the Act than to permit state and federal courts, without any limitation, to exercise jurisdiction over activities that are subject to regulation by the National Labor Relations Board. See *Motor Coach Employees* v. *Lockridge,* [403 U. S. 274, 286]. Congress created the centralized expert agency to administer the Act because of its conviction—generated by the historic abuses of the labor injunction, . . . that the judicial attitudes, court procedures, and traditional judicial remedies, state and federal, were as likely to produce adjudications incompatible with national labor policy as were different rules of substantive law. See *Garner* v. *Teamsters,* 346 U. S. 485, 490–491 (1953)." *Sears,* 436 U. S., at 218 (BRENNAN, J., dissenting).

[10] 29 U. S. C. § 158.

[11] 29 U. S. C. § 157.

[12] "Cases that have held state authority to be pre-empted by federal law tend to fall into one of two categories: (1) those that reflect the concern that 'one forum would enjoin, as illegal, conduct which the other forum would find legal' and (2) those that reflect the concern 'that the [application of state law by] state courts would restrict the exercise of rights guaranteed by the Federal Acts.' *Automobile Workers* v. *Russell,* 356 U. S. 634, 644 (1958). '[I]n referring to decisions holding state laws pre-empted by the NLRA, care must be taken to distinguish pre-emption based on federal protection of the conduct in question . . . from that based predominantly on the primary jurisdiction of the National Labor Relations Board . . . , although the two are often not easily separable.' *Railroad Trainmen* v. *Jacksonville Terminal Co.,* 394 U. S. 369, 383 n. 19

sequently, almost all of the Court's labor law decisions in which state regulatory schemes have been found to be pre-empted have involved state efforts to regulate or to prohibit private conduct that was either protected by § 7, prohibited by § 8,[13] or at least arguably so protected or prohibited.[14]

In contrast to those decisions, there is no claim in this case that New York has sought to regulate or prohibit any conduct subject to the regulatory jurisdiction of the Labor Board under § 8.[15] Nor are the petitioning employers pursuing any claim of interference with employee rights protected by § 7. The State simply authorized striking employees to receive unemployment benefits, and assessed a tax against the struck employers to pay for some of those benefits, once the economic warfare between the two groups reached its ninth week. Accordingly, beyond identifying the interest in national uniformity underlying the doctrine, the cases compris-

(1969)." *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132, 138.

[13] *E. g., Weber* v. *Anheuser-Busch, Inc.*, 348 U. S. 468; *Garner* v. *Teamsters*, 346 U. S. 485; *Hill* v. *Florida ex rel. Watson*, 325 U. S. 538.

[14] *E. g., Iron Workers* v. *Perko*, 373 U. S. 701; *Plumbers* v. *Borden*, 373 U. S. 690; *Marine Engineers* v. *Interlake S. S. Co.*, 370 U. S. 173.

[15] Cf. *Nash* v. *Florida Industrial Comm'n*, 389 U. S. 235, in which the Court held that the NLRA pre-empted a state policy of denying unemployment benefits to persons who filed unfair labor practice charges against their former employer. Relying upon § 8 (a) (4) of the Act, which makes it an unfair labor practice for an employer to restrain or discriminate against an employee who files charges, the Court concluded that the state statute trenched on the employees' federally protected rights contrary to the Supremacy Clause. 389 U. S., at 238–239.

For similar reasons, we reject petitioners' contention that the NLRA at the least forbids the States from awarding benefits to participants in *illegal* strikes. See *Communication Workers of America (New York Telephone Co.)*, 208 N. L. R. B. 267 (1974) (declaring part of the strike involved in this case illegal). Because such a rule would inevitably involve the States in ruling on the legality of strikes under § 8, it would invite precisely the harms that the pre-emption doctrine is designed to avoid.

ing the main body of labor pre-emption law are of little relevance in deciding this case.

There is, however, a pair of decisions in which the Court has held that Congress intended to forbid state regulation of economic warfare between labor and management, even though it was clear that none of the regulated conduct on either side was covered by the federal statute.[16] In *Teamsters* v. *Morton,* 377 U. S. 252, the Court held that an Ohio court could not award damages against a union for peaceful secondary picketing even though the union's conduct was neither protected by § 7 nor prohibited by § 8. Because Congress had focused upon this type of conduct and elected not to proscribe it when § 303 of the Labor Management Relations Act [17] was enacted, the Court inferred a deliberate legislative intent to preserve this means of economic warfare for use during the bargaining process.[18]

---

[16] Although a leading commentator in this area contends that "[t]here are numerous situations in which the conduct is not arguably protected or prohibited but state law is precluded," Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1364 (1972), the Court has been faced with such situations on only the two occasions discussed in text. Dicta in other cases, however, have occasionally been cited in this context. See *Hanna Mining Co.* v. *Marine Engineers,* 382 U. S. 181, 187; *Retail Clerks* v. *Schermerhorn,* 375 U. S. 96 (negative implication of the holding); *Garner* v. *Teamsters, supra,* at 500.

[17] 29 U. S. C. § 187.

[18] "This weapon of self-help, permitted by federal law, formed an integral part of the petitioner's effort to achieve its bargaining goals during negotiations with the respondent. Allowing its use is a part of the balance struck by Congress between the conflicting interests of the union, the employees, the employer and the community. *Electrical Workers Local 761* v. *Labor Board,* 366 U. S. 667, 672. If the Ohio law of secondary boycott can be applied to proscribe the same type of conduct which Congress focused upon but did not proscribe when it enacted § 303, the inevitable result would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy. 'For a state to impinge on the area of labor combat designed to be free is

More recently, in *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S. 132, the Court held that the state Commission could not prohibit a union's concerted refusal to work overtime. Although this type of partial strike activity had not been the subject of special congressional consideration, as had the secondary picketing involved in *Morton,* the Court nevertheless concluded that it was a form of economic self-help that was " 'part and parcel of the process of collective bargaining,' " 427 U. S., at 149 (quoting *NLRB* v. *Insurance Agents,* 361 U. S. 477, 495), that Congress implicitly intended to be governed only by the free play of economic forces. The Court identified the crucial inquiry in its pre-emption analysis in *Machinists* as whether the exercise of state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the policies of the National Labor Relations Act.[19]

The economic weapons employed by labor and management in *Morton, Machinists,* and the present case are similar, and petitioners rely heavily on the statutory policy, emphasized in the former two cases, of allowing the free play of economic forces to operate during the bargaining process. Moreover, because of the twofold impact of § 592 (1), which not only provides financial support to striking employees but also adds to the burdens of the struck employers, see n. 5, *supra,* we must accept the District Court's finding that New York's law, like the state action involved in *Morton* and *Machinists,*

quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits.' *Garner* v. *Teamsters Union,* 346 U. S. 485, 500." *Teamsters* v. *Morton,* 377 U. S., at 259–260.

[19] "Whether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes.' *Railroad Trainmen* v. *Jacksonville Terminal Co.,* 394 U. S., at 380." 427 U. S., at 147–148. See also *id.,* at 147 n. 8

532

has altered the economic balance between labor and management.[20]

But there is not a complete unity of state regulation in the three cases.[21] Unlike *Morton* and *Machinists,* as well as the main body of labor pre-emption cases, the case before us today does not involve any attempt by the State to regulate or prohibit private conduct in the labor-management field. It involves a state program for the distribution of benefits to certain members of the public. Although the class benefited is primarily made up of employees in the State and the

[20] What was said in *Super Tire Engineering Co.* v. *McCorkle,* 416 U. S. 115, 123–124, about a state benefits plan for strikers that did not impose a contributory burden on struck employers applies with special force in the present case with its twofold impact:

"Rather, New Jersey has declared positively that able-bodied striking workers who are engaged, individually and collectively, in an economic dispute with their employer are eligible for economic benefits. This policy is fixed and definite. It is not contingent upon executive discretion. Employees know that if they go out on strike, public funds are available. The petitioners' claim is that this eligibility affects the collective-bargaining relationship, both in the context of a live labor dispute when a collective-bargaining agreement is in process of formulation, *and* in the ongoing collective relationship, so that the economic balance between labor and management, carefully formulated and preserved by Congress in the federal labor statutes, is altered by the State's beneficent policy toward strikers. It cannot be doubted that the availability of state welfare assistance for striking workers in New Jersey pervades every work stoppage, affects every existing collective-bargaining agreement, and is a factor lurking in the background of every incipient labor contract. The question, of course, is whether Congress, explicitly or implicitly, has ruled out such assistance in its calculus of laws regulating labor-management disputes." See also *Ohio Bureau of Employment Services* v. *Hodory,* 431 U. S. 471, 492.

[21] "[T]he conduct being regulated, not the formal description of governing legal standards, . . . is the proper focus of concern" in pre-emption cases. *Motor Coach Employees* v. *Lockridge,* 403 U. S. 274, 292. Nevertheless, in assessing whether there is "conflicting [state and federal] regulation" of the conduct, *ibid.,* the scope, purport, and impact of the state program may not be ignored.

class providing the benefits is primarily made up of employers in the State, and although some of the members of each class are occasionally engaged in labor disputes, the general purport of the program is not to regulate the bargaining relationships between the two classes but instead to provide an efficient means of insuring employment security in the State.[22] It is therefore clear that even though the statutory policy underlying *Morton* and *Machinists* lends support to petitioners' claim, the holdings in those cases are not controlling. The Court is being asked to extend the doctrine of labor law pre-emption into a new area.

## II

The differences between state laws regulating private conduct and the unemployment-benefits program at issue here are important from a pre-emption perspective. For a variety of reasons, they suggest an affinity between this case and others in which the Court has shown a reluctance to infer a pre-emptive congressional intent.

Section 591 (1) is not a "state la[w] regulating the relations between employees, their union, and their employer," as to which the reasons underlying the pre-emption doctrine have their "greatest force." *Sears,* 436 U. S., at 193. Instead, as discussed below, the statute is a law of general applicability. Although that is not a sufficient reason to exempt it from pre-emption, *Farmer* v. *Carpenters,* 430 U. S. 290, 300, our cases have consistently recognized that a congressional intent to deprive the States of their power to enforce such general laws is more difficult to infer than an intent to pre-empt laws directed specifically at concerted activity. See *id.,* at 302; *Sears, supra,* at 194–195; Cox, *supra* n. 16, at 1356–1357.

---

[22] For these same reasons, § 591 (1) may be distinguished from a hypothetical state law, unattached to any benefits scheme, that imposes a fine on struck employers who failed to come to terms with striking employees within an allotted time period.

534

Because New York's program, like those in other States, is financed in part by taxes assessed against employers, it is not strictly speaking a public welfare program.[23] It nevertheless remains true that the payments to the strikers implement a broad state policy that does not primarily concern labor-management relations, but is implicated whenever members of the labor force become unemployed. Unlike most States,[24] New York has concluded that the community interest in the security of persons directly affected by a strike outweighs the interest in avoiding any impact on a particular labor dispute.

As this Court has held in a related context, such unemployment benefits are not a form of direct compensation paid to strikers by their employer; they are disbursed from public funds to effectuate a public purpose. *NLRB* v. *Gullett Gin*

---

[23] When confronted with welfare programs, the Courts of Appeals have been unwilling to imply a pre-emptive congressional intent. *Super Tire Engineering Co.* v. *McCorkle,* 550 F. 2d 903 (CA3 1977), cert. denied, 434 U. S. 827; *Francis* v. *Chamber of Commerce,* 529 F. 2d 515 (CA4 1975) (mem.) (unreported opinion), rev'd on other grounds *sub nom. Batterton* v. *Francis,* 432 U. S. 416; see *ITT Lamp Division* v. *Minter,* 435 F. 2d 989, 994 (CA1 1970), cert. denied, 402 U. S. 933. It is interesting to note that under the economic-impact test applied by the District Court in this case, there is no meaningful way, for pre-emption purposes, to distinguish between unemployment and welfare programs. See n. 5, *supra.*

[24] This may be an overstatement. It is true that only Rhode Island has a statutory provision like New York's that allows strikers to receive benefits after a waiting period of several weeks. See *Grinnell Corp.* v. *Hackett,* 475 F. 2d 449, 457–459 (CA1 1973). But most States provide benefits to striking employees who have been replaced by nonstriking employees, and many States, pursuant to the so-called "American rule," allow strikers to collect benefits so long as their activities have not substantially curtailed the productive operations of their employer. See *Hawaiian Telephone Co.* v. *Hawaii Dept. of Labor & Industrial Relations,* 405 F. Supp. 275, 287–288 (Haw. 1976), cert. denied, 435 U. S. 943. For example, in *Kimbell, Inc.* v. *Employment Security Comm'n,* 429 U. S. 804, this Court dismissed for want of a substantial federal question an appeal from the Supreme Court of New Mexico which had held that a retroactive post-strike award of unemployment benefits to strikers under the "American rule" was not pre-empted by federal labor law.

*Co.,* 340 U. S. 361, 364–365. This conclusion is no less true because New York has found it most efficient to base employer contributions to the insurance program on "experience ratings." *Id.,* at 365. Although this method makes the struck, rather than all, employers primarily responsible for financing striker benefits, the employer-provided moneys are nonetheless funneled through a public agency, mingled with other—and clearly public—funds, and imbued with a public purpose.[25] There are obvious reasons, in addition, why the pre-emption doctrine should not "hinge on the myriad provisions of state unemployment compensation laws." *Ibid.*[26]

---

[25] Despite the experience-rating system, it is almost inevitable that some of the unemployment payments will be charged to the individual accounts of nonstruck employers as well as to a general account funded by the entire class of employers and by the Federal Government. See n. 4, *supra.*

[26] "But respondent argues that the benefits paid from the Louisiana Unemployment Compensation Fund were not collateral but direct benefits. With this theory we are unable to agree. Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state. See Dart's La. Gen. Stat., 1939, § 4434.1; *In re Cassaretakis,* 289 N. Y. 119, 126, 44 N. E. 2d 391, 394–395, aff'd *sub nom. Standard Dredging Co.* v. *Murphy,* 319 U. S. 306; *Unemployment Compensation Commission* v. *Collins,* 182 Va. 426, 438, 29 S. E. 2d 388, 393. We think these facts plainly show the benefits to be collateral. It is thus apparent from what we have already said that failure to take them into account in ordering back pay does not make the employees more than 'whole' as that phrase has been understood and applied.

"Finally, respondent urges that the Board's order imposes upon it a penalty which is beyond the remedial powers of the Board because, to the extent that unemployment compensation benefits were paid to its discharged employees, operation of the experience-rating record formula under the Louisiana Act, Dart's La. Gen. Stat., 1939 (Cum. Supp. 1949) §§ 4434.1 *et seq.,* will prevent respondent from qualifying for a lower tax rate. We doubt that the validity of a back-pay order ought to hinge on

New York's program differs from state statutes expressly regulating labor-management relations for another reason. The program is structured to comply with a federal statute, and as a consequence is financed, in part, with federal funds. The federal subsidy mitigates the impact on the employer of any distribution of benefits. See n. 4, *supra*. More importantly, as the Court has pointed out in the past, the federal statute authorizing the subsidy provides additional evidence of Congress' reluctance to limit the States' authority in this area.

Title IX of the Social Security Act of 1935 established the participatory federal unemployment compensation scheme. The statute authorizes the provision of federal funds to States having programs approved by the Secretary of Labor.[27] In *Ohio Bureau of Employment Services* v. *Hodory*, 431 U. S. 471, an employee who was involuntarily deprived of his job because of a strike claimed a federal right under Title IX to collect benefits from the Ohio Bureau. Specifically, he contended that Ohio's statutory disqualification of claims based on certain labor disputes was inconsistent with a federal re-

the myriad provisions of state unemployment compensation laws. Cf. *Labor Board* v. *Hearst Publications*, 322 U. S. 111, 122–124. However, even if the Louisiana law has the consequence stated by respondent, which we assume *arguendo*, this consequence does not take the order without the discretion of the Board to enter. We deem the described injury to be merely an incidental effect of an order which in other respects effectuates the policies of the federal Act. It should be emphasized that any failure of respondent to qualify for a lower tax rate would not be primarily the result of federal but of state law, designed to effectuate a public policy with which it is not the Board's function to concern itself." *NLRB* v. *Gullett Gin Co.*, 340 U. S., at 364–365 (footnotes omitted). See also *Carmichael* v. *Southern Coal Co.*, 301 U. S. 495, 508.

[27] In broad outline, the federal scheme imposes a tax on employers which the States may mitigate (as all have done) by establishing their own unemployment programs. 26 U. S. C. § 3301. State programs qualified by the Secretary of Labor are then eligible for federal funds. 42 U. S. C. §§ 501–503.

quirement that all persons involuntarily unemployed must be eligible for benefits.

Our review of both the statute and its legislative history convinced us that Congress had not intended to prescribe the nationwide rule that Hodory urged us to adopt. The voluminous history of the Social Security Act made it abundantly clear that Congress intended the several States to have broad freedom in setting up the types of unemployment compensation that they wish.[28]   We further noted that when Congress

[28] "Appellee cites only a single page of the voluminous legislative history of the Social Security Act in support of his assertion that the Act forbids disqualification of persons laid off due to a labor dispute at a related plant. That page contains the sentence: 'To serve its purposes, unemployment compensation must be paid only to workers involuntarily unemployed.' Report of the Committee on Economic Security, as reprinted in Hearings on S. 1130 before the Senate Committee on Finance, 74th Cong., 1st Sess., 1311, 1328 (1935).

"The cited Report was one to the President of the United States and became the cornerstone of the Social Security Act.   On its face, the quoted sentence may be said to give some support to appellee's claim that 'involuntariness' was intended to be the key to eligibility.   A reading of the entire Report and consideration of the sentence in context, however, show that Congress did not intend to require that the States give coverage to every person involuntarily unemployed.

"The Report recognized that federal definition of the scope of coverage would probably prove easier to administer than individualized state plans, *id.*, at 1323, but it nonetheless recommended the form of unemployment compensation scheme that exists today, namely, federal involvement primarily through tax incentives to encourage state-run programs.   The Report's section entitled 'Outline of Federal Act' concludes with the statement:

" 'The plan for unemployment compensation that we suggest contemplates that the States shall have broad freedom to set up the type of unemployment compensation they wish.   We believe that all matters in which uniformity is not absolutely essential should be left to the States. The Federal Government, however, should assist the States in setting up their administrations and in the solution of the problems they will encounter.'   *Id.*, at 1326."   431 U. S., at 482–483.

In addition to undercutting petitioners' general argument that federal law restricts New York's freedom to provide unemployment benefits to

wished to impose or forbid a condition for compensation, it did so explicitly; the absence of such an explicit condition was therefore accepted as a strong indication that Congress did not intend to restrict the States' freedom to legislate in this area.[29]

The analysis in *Hodory* confirmed this Court's earlier interpretation of Title IX of the Social Security Act in *Steward Machine Co.* v. *Davis,* 301 U. S. 548,[30] and was itself con-

---

strikers, this legislative history also belies their more specific claim that *involuntary* unemployment must be "the key to eligibility" under Title IX-qualified programs.

[29] "Indeed, study of the various provisions cited shows that when Congress wished to impose or forbid a condition for compensation, it was able to do so in explicit terms.[16]  There are numerous examples, in addition to the one set forth in n. 16, less related to labor disputes but showing congressional ability to deal with specific aspects of state plans.[17]  The fact that Congress has chosen not to legislate on the subject of labor dispute disqualifications confirms our belief that neither the Social Security Act nor the Federal Unemployment Tax Act was intended to restrict the States' freedom to legislate in this area.

"[16] See, for example, 26 U. S. C. § 3304 (a)(5), which from the start has provided:

" '(5) compensation shall not be denied in such State to any otherwise eligible individual for refusing to accept new work under any of the following conditions:

" '(A) if the position offered is vacant due directly to a strike, lockout, or other labor dispute;

" '(B) if the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality;

" '(C) if as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona fide labor organization.'

"[17] See Employment Security Amendments of 1970, 84 Stat. 695; Emergency Unemployment Compensation Act of 1971, 85 Stat. 811; Emergency Unemployment Compensation Act of 1974, 88 Stat. 1869; Unemployment Compensation Amendments of 1976, 90 Stat. 2667." *Id.,* at 488–489, and nn. 16, 17.

[30] "A wide range of judgment is given to the several states as to the particular type of statute to be spread upon their books.  For anything

firmed by the Court's subsequent interpretation of Title IV of the Act in *Batterton* v. *Francis*, 432 U. S. 416.[31] These cases demonstrate that Congress has been sensitive to the importance of the States' interest in fashioning their own unemployment compensation programs and especially their own eligibility criteria.[32] It is therefore appropriate to treat

to the contrary in the provisions of this act they may use the pooled unemployment form, which is in effect with variations in Alabama, California, Michigan, New York, and elsewhere. They may establish a system of merit ratings applicable at once or to go into effect later on the basis of subsequent experience. . . . They may provide for employee contributions as in Alabama and California, or put the entire burden upon the employer as in New York. They may choose a system of unemployment reserve accounts by which an employer is permitted after his reserve has accumulated to contribute at a reduced rate or even not at all. This is the system which had its origin in Wisconsin. What they may not do, if they would earn the credit, is to depart from those standards which in the judgment of Congress are to be ranked as fundamental." 301 U. S., at 593–594.

[31] In *Batterton*, the Court was faced with the question of whether the eligibility criteria for certain unemployment benefits under Title IV of the Act (AFDC–UF) were to be set nationally by the Secretary of Health, Education, and Welfare or locally by each State. The Court found the presumption in favor of "cooperative federalism" and the free play of "legitimate local policies in determining eligibility" strong enough to overcome considerable "varian[t]" legislative history concerning a recent amendment to the statute. Thus, despite references in the congressional Reports accompanying the amendment to "a uniform" and "a Federal definition of unemployment," the Court concluded that Congress had not intended to replace the various state definitions of unemployment with a federal one, and it specifically left the States free to provide benefits to strikers. This result is the more persuasive in the present context because the *Batterton* Court, citing *Hodory*, commented that the federal restraints imposed on state unemployment programs by Title IX are "not so great"—and thus not as likely pre-emptive—as those imposed by Title IV. 432 U. S., at 419.

[32] The force of the legislative history discussed in *Hodory*, *Steward*, and *Batterton*, comes close to removing this case from the pre-emption setting altogether. In light of those decisions, the case may be viewed as presenting a potential conflict between two federal statutes—Title IX of the Social Security Act and the NLRA—rather than between federal and

New York's statute with the same deference that we have afforded analogous state laws of general applicability that protect interests "deeply rooted in local feeling and responsibility." With respect to such laws, we have stated "that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 244.[33]

## III

Pre-emption of state law is sometimes required by the terms of a federal statute. See, *e. g., Ray* v. *Atlantic Richfield Co.,* 435 U. S. 151, 173–179. This, of course, is not such a case. Even when there is no express pre-emption, any proper application of the doctrine must give effect to the intent of Congress. *Malone* v. *White Motor Corp.,* 435 U. S. 497, 504. In this case there is no evidence that the Congress that enacted the National Labor Relations Act in 1935 intended to deny the States the power to provide unemployment benefits for strikers.[34] Cf. *Hodory,* 431 U. S., at 482. Far from the compelling congressional direction on which pre-emption in this case would have to be predicated, the silence of Congress in 1935 actually supports the contrary inference that Congress intended to allow the States to make this policy determination for themselves.

New York was one of five States that had an unemployment insurance law before Congress passed the Social Security

---

state regulatory statutes. But however the conflict is viewed, its ultimate resolution depends on an analysis of congressional intent.

[33] See also *Construction Workers* v. *Laburnum Construction Corp.,* 347 U. S. 656 (threats of violence); *Youngdahl* v. *Rainfair, Inc.,* 355 U. S. 131 (violence); *Automobile Workers* v. *Russell,* 356 U. S. 634 (violence); *Linn* v. *Plant Guard Workers,* 383 U. S. 53 (libel); *Farmer* v. *Carpenters,* 430 U. S. 290 (intentional infliction of mental distress).

[34] See *Grinnell Corp.,* 475 F. 2d, at 454–457; *Hawaiian Telephone Co.,* 405 F. Supp., at 285–286; *Dow Chemical Co.* v. *Taylor,* 57 F. R. D. 105, 108 (ED Mich. 1972).

and the Wagner Acts in the summer of 1935.[35]   Although the New York law did not then assess taxes against employers on the basis of their individual experience, it did authorize the payment of benefits to strikers out of a general fund financed by assessments against all employers in the State.   The junior Senator from New York, Robert Wagner, was a principal sponsor of both the National Labor Relations Act and the Social Security Act;[36] the two statutes were considered in Congress simultaneously and enacted into law within five weeks of one another; and the Senate Report on the Social Security bill, in the midst of discussing the States' freedom of choice with regard to their unemployment compensation laws, expressly referred to the New York statute as a qualifying example.[37]   Even though that reference did not mention the subject of benefits for strikers, it is difficult to believe that

---

[35] See generally *Steward*, 301 U. S., at 593–594.

[36] Wagner was also a prominent advocate of local freedom of choice with respect to unemployment benefits programs.   In introducing the bill that became the Social Security Act to the Senate Committee on Finance, he stated:

"With growing recognition of the need for unemployment insurance, there has come considerable sentiment for the enactment of a single and uniform national system.   Its proponents advance the argument, among others, that only in this way can a worker who migrates from New York to New Mexico be kept under the same law at all times.   This, of course, is true.   But there are an infinitely greater number of workers, and industries, that remain permanently within the boundaries of these two States, respectively, and that are permanently subjected to entirely different industrial conditions.   European experience with unemployment insurance has demonstrated that every major attempt, except in Russia, has been successful and has been continued.   But it has also shown that widely varying systems have been applied to divergent economic settings.   Our own extent of territory is so great, and our enterprises so dissimilar in far-flung sections, that we should, at least for a time, experiment in 48 separate laboratories."   Hearings on S. 1130 before the Senate Committee on Finance, 74th Cong., 1st Sess., 3 (1935).

[37] See S. Rep. No. 628, 74th Cong., 1st Sess., 13 (1935).

Senator Wagner [38] and his colleagues were unaware of such a controversial provision, particularly at a time when both unemployment and labor unrest were matters of vital national concern.

Difficulty becomes virtual impossibility when it is considered that the issue of public benefits for strikers became a matter of express congressional concern in 1935 during the hearings and debates on the Social Security Act.[39] As already noted, the scheme of the Social Security Act has always allowed the States great latitude in fashioning their own programs. From the beginning, however, the Act has contained a few specific requirements for federal approval. One of these provides that a State may not deny compensation to an otherwise qualified applicant because he had refused to accept work as a strikebreaker, or had refused to resign from a union as a condition of employment.[40] By contrast, Congress rejected the suggestions of certain advisory members of the Roosevelt administration as well as some representatives of citizens and business groups that the States be prohibited

---

[38] Senator Wagner, in particular, had long taken an active interest and role in the design of social welfare and labor legislation in his home State of New York. Before leaving that State's legislature for the national one, for example, he had been the moving force behind such landmark statutes as New York's workmen's compensation law. See Webster's American Biographies 1081 (C. Van Doren & R. McHenry eds. 1974).

[39] This controversy, in fact, had troubled the National Government for at least two years preceding the passage of the Social Security and Wagner Acts. In July 1933, the Federal Emergency Relief Administration ruled that unemployed strikers would be eligible for relief benefits, a policy that was carried out amid considerable outcry from the press and the business community during the textile strike of September 1934. I. Bernstein, Turbulent Years: A History of the American Worker, 1933–1941, p. 307 (1970). During the same weeks as the newspapers carried stories about the strike, in fact, Senator Wagner was revising previously offered labor-relations proposals into a new bill that became the NLRA. *Id.*, at 323.

[40] This provision, 26 U. S. C. § 3304 (a) (5), is quoted in n. 29, *supra*.

from providing benefits to strikers.[41]  The drafters of the Act apparently concluded that such proposals should be addressed to the individual state legislatures "without dictation from Washington." [42]

---

[41] During the hearings on the Social Security Act, written submissions offered by both Edwin Witte, Director of the President's Committee on Economic Security, on behalf of that Committee's Advisory Council, and Abraham Epstein, representing the American Association for Social Security, a citizen's group devoted to promoting social security legislation, recommended withholding benefits from strikers during a strike.  Hearings on S. 1130, *supra* n. 36, at 228, 472.  An even stronger suggestion, which would have disqualified strikers even after the strike was over, was made by a spokesman for the National Association of Manufacturers.

It is also probative that just two weeks after the Social Security Act became law Congress, in its capacity as the legislature for the District of Columbia, passed an unemployment program for that locality which expressly precluded strikers from receiving benefits so long as a labor dispute was in "active progress."  Act of Aug. 28, 1935, ch. 794, § 10 (a), 49 Stat. 950.  That it included the restriction in the local Social Security Act, but not in the national one, suggests the strength of its commitment to free local choice.  That it did so is also important evidence that it neither assumed nor intended that its passage of the NLRA seven weeks earlier would pre-empt the payment of benefits to strikers in any case.

Of these four antistriker proposals considered by Congress during 1935, it is interesting to note that three allowed former strikers to receive benefits once the strike was ended.  In light of these provisions, it seems clear that Congress perceived the opposition to such benefits not simply as a reflection of the view that voluntary unemployment should never be compensated but also as a concern with the nonneutral impact of such benefits on labor disputes.  Its refusal explicitly to go along with that opposition on the national level with respect to the Social Security Act is thus all the more relevant to its intent in passing the NLRA several weeks earlier.

[42] "Except for a few standards which are necessary to render certain that the State unemployment compensation laws are genuine unemployment compensation acts and not merely relief measures, the States are left free to set up any unemployment compensation system they wish, without dictation from Washington.  The States may or may not add employee contributions to those required from the employers.  Of the 5 States which have thus far enacted unemployment compensation laws, 2 require

544

Undeniably, Congress was aware of the possible impact of unemployment compensation on the bargaining process. The omission of any direction concerning payment to strikers in either the National Labor Relations Act or the Social Security Act implies that Congress intended that the States be free to authorize, or to prohibit, such payments.[43]

Subsequent events confirm our conclusion that the congressional silence in 1935 was not evidence of an intent to pre-empt the States' power to make this policy choice. On several occasions since the 1930's Congress has expressly addressed the question of paying benefits to strikers, and especially the effect of such payments on federal labor policy.[44] On none of these occasions has it suggested that such

employee contributions, and 3 do not. Likewise, the States may determine their own compensation rates, waiting periods, and maximum duration of benefits. Such latitude is very essential because the rate of unemployment varies greatly in different States, being twice as great in some States as in others." S. Rep. No. 628, *supra* n. 37, at 13.

[43] The contemporaneous interpretation of Title IX by the Social Security Board, the administrative agency originally charged by Title IX of the Act with qualifying state statutes for federal funds, bears out this conclusion. Within a short time after the Act was passed, the Board approved the New York statute which provided benefits to strikers. The Labor Department has periodically followed suit since it took over authority in the area. 566 F. 2d 388, 393–394.

[44] Congress twice has considered and rejected amendments to existing laws that would have excluded strikers from receiving unemployment benefits. The House version of the Labor Management Relations Act of 1947 included a provision denying § 7 rights under the NLRA to any striking employee who accepted unemployment benefits from the State. H. R. 3020, § 2 (3), 80th Cong., 1st Sess. (1947). This provision, which responded to public criticism of Pennsylvania's payment of benefits to striking miners in 1946, was rejected by the Senate and deleted by the Conference Committee. H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 32–33 (1947). Although the deletion was not explained, the House Minority Report suggests a reason: "Under the Social Security Act, however, the determination [of eligibility] was advisedly left to the States." H. R. Rep. No. 245, 80th Cong., 1st Sess., 68 (1947).

In 1969, the Nixon Administration proposed an amendment to the

payments were already prohibited by an implicit federal rule of law. Nor, on any of these occasions has it been willing to supply the prohibition. The fact that the problem has been discussed so often supports the inference that Congress was well aware of the issue when the Wagner Act was passed in 1935, and that it chose, as it has done since, to leave this aspect of unemployment compensation eligibility to the States.

In all events, a State's power to fashion its own policy concerning the payment of unemployment compensation is not to be denied on the basis of speculation about the unexpressed intent of Congress. New York has not sought to regulate private conduct that is subject to the regulatory jurisdiction of the National Labor Relations Board. Nor, indeed, has it sought to regulate any private conduct of the parties to a labor dispute. Instead, it has sought to administer its unemployment compensation program in a manner

---

Social Security Act that would have excluded strikers from unemployment compensation eligibility. Speaking in opposition to the proposal, Congressman Mills made the following comment:

"We have tried to keep from prohibiting the States from doing the things the States believe are in the best interest of their people. There are a lot of decisions in this whole program which are left to the States.

"For example, there are two States, I recall, which will pay unemployment benefits when employees are on strike, but only two out of 50 make that decision. That is their privilege to do so. . . . I would not vote for it . . . , but if the State wants to do it we believe they ought to be given latitude to enable them to write the program they want." 115 Cong. Rec. 34106 (1969).
Congress rejected the proposal.

On two other occasions, Congress has confronted the problem of providing purely federal unemployment and welfare benefits to persons involved in labor disputes. In both instances, it has drawn the eligibility criteria broadly enough to encompass strikers. 45 U. S. C. § 354 (a-2) (iii) (Railroad Unemployment Insurance Act); 7 U. S. C. § 2014 (c) (Food Stamp Act). It thereby rejected the argument that such elibility forces the Federal Government "to take sides in labor disputes." H. R. Rep. No. 91-1402, p. 11 (1970).

that it believes best effectuates the purposes of that scheme. In an area in which Congress has decided to tolerate a substantial measure of diversity, the fact that the implementation of this general state policy affects the relative strength of the antagonists in a bargaining dispute is not a sufficient reason for concluding that Congress intended to pre-empt that exercise of state power.

The judgment of the Court of Appeals is

*Affirmed.*

Mr. Justice Brennan, concurring in the result.

I agree that the New York statute challenged in this case does not regulate or prohibit private conduct that is either arguably protected by § 7 or arguably prohibited by § 8 of the NLRA. Any claim that the New York law is pre-empted must therefore be based on the principles applied in *Teamsters* v. *Morton,* 377 U. S. 252 (1964), and *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S. 132 (1976). Although I agree that the "statutory policy" articulated in those cases has some limits, I am not completely at ease with the distinctions employed by my Brother Stevens in this case to define those limits.* However, since I agree with my Brother

---

*My Brother Stevens correctly observes that our past pre-emption cases have dealt with statutes that regulate private conduct, rather than confer public benefits, but does not make clear why these different objectives justify different levels of scrutiny. Furthermore, although the distinction between laws of general applicability and laws directed particularly at labor-management relations perhaps has more significance in the application of the principles of *Machinists* than in the application of pre-emption principles where Congress has arguably protected or prohibited conduct, see Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1355–1356 (1972), I am not at all sure that the New York statute is a law of general applicability. See *id.,* at 1356; Powell, J., dissenting, *post,* at 557, and n. 10. I find more substance in my Brother Stevens' conclusion that the legislative history of the Social Security Act supports the argument that New York's law should be accorded a deference not unlike that accorded state

BLACKMUN's conclusion that the legislative histories of the NLRA and the Social Security Act reviewed in my Brother STEVENS' opinion provide sufficient evidence of congressional intent to decide this case without relying on those distinctions, I see no reason at this time either to embrace the distinctions or to deny that they may have relevance to pre-emption analysis in other cases.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE MAR-SHALL joins, concurring in the judgment.

I concur in the result. I agree with that portion of Part III of the plurality's opinion where the conclusion is reached that Congress has made its decision to permit a State to pay unemployment benefits to strikers. (Whether Congress has made that decision wisely is not for this Court to say.) Because I am not at all certain that the plurality's opinion is fully consistent with the principles recently enunciated in *Machinists* v. *Wisconsin Emp. Rel. Comm'n,* 427 U. S. 132 (1976), I refrain from joining the opinion's pre-emption analysis.

The plurality recognizes, *ante,* at 531, that the economic weapons employed in this case are similar to those under consideration in *Machinists;* there, too, the Court concluded that Congress intended to leave the employment of such weapons to the free play of economic forces, and not subject to regulation by either the State or the NLRB. And the opinion also recognizes, *ante,* at 531–532, as the District Court and the Court of Appeals both found, that New York's statutory policy of paying unemployment benefits to strikers does indeed alter the economic balance between labor and management. See *Super Tire Engineering Co.* v. *McCorkle,* 416 U. S. 115, 123–124 (1974).

But the plurality now appears to hold, *ante,* at 532–533, that

laws touching interests deeply rooted in local feeling and responsibility. Indeed, he may be correct in suggesting that this case is more a case of conflicting federal statutes than a pre-emption case, *ante,* at 539–540, n. 32.

the analysis developed in *Machinists* and in its predecessor case, *Teamsters* v. *Morton,* 377 U. S. 252 (1964), is inapplicable in the evaluation of the New York statute at issue here. The plurality seems to say that since the state statute does not purport to regulate private conduct in labor-management relations, but rather is intended to serve the State's general purpose of providing benefits to certain members of the public in order to insure employment security, the *Machinists-Morton* analysis is not controlling. Relying on decisions of this Court indicating that Congress has been sensitive to the need to allow the States leeway in fashioning unemployment programs (see *Batterton* v. *Francis,* 432 U. S. 416 (1977); *Ohio Bureau of Employment Services* v. *Hodory,* 431 U. S. 471 (1977); *Steward Machine Co.* v. *Davis,* 301 U. S. 548 (1937)), the opinion then finds it appropriate to treat the New York statute with the deference afforded general state laws that protect state interests "deeply rooted in local feeling and responsibility." *San Diego Bldg. Trades Council* v. *Garmon,* 359 U. S. 236, 244 (1959). Accordingly, the opinion concludes that " 'in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power' " to establish unemployment compensation programs like that of New York, *ante,* at 540, quoting *Garmon,* 359 U. S., at 244.

This requirement that petitioners must demonstrate "compelling congressional direction" in order to establish pre-emption is not, I believe, consistent with the pre-emption principles laid down in *Machinists.* In that case, to repeat, the Court recognized that Congress had committed the use of economic self-help weapons to the free play of economic forces, and held that Wisconsin's attempt to regulate what the federal law had failed to curb denied one party a weapon Congress meant that party to have available to it. 427 U. S., at 150. I believe, however, that *Machinists* indicates that the States are *not* free, entirely and always, directly to enhance

the self-help capability of one of the parties to such a dispute so as to result in a significant shift in the balance of bargaining power struck by Congress. Where the exercise of state authority to curtail, prohibit, or enhance self-help " 'would frustrate effective implementation of the Act's processes,' " *id.,* at 148, quoting *Railroad Trainmen* v. *Jacksonville Terminal Co.,* 394 U. S. 369, 380 (1969), I believe *Machinists* compels the conclusion that Congress intended to pre-empt such state activity, unless there is evidence of congressional intent to tolerate it.

The difference between *Machinists* and this case, it seems to me, is in the initial premise. In the present case, the plurality appears to be saying that there is no pre-emption unless "compelling congressional direction" indicates otherwise. The premise is therefore one of assumed priority on the state side. In *Machinists,* on the other hand, the Court said, I thought, that there *is* pre-emption unless there is evidence of congressional intent to tolerate the state practice. That premise, therefore, is one of assumed priority on the federal side. The distinction is not semantic.

Despite the distinction, however, either approach leads to the same result in the present case. The evidence recited in Part III of the plurality's opinion establishes that Congress has decided to tolerate any interference caused by an unemployment compensation statute such as New York's. But this fortuity should not obscure a difference in reasoning that could prove important in some other pre-emption case. Where evidence of congressional intent to tolerate a State's significant alteration of the balance of economic power is lacking, *Machinists* might still require a holding of pre-emption notwithstanding the lack of compelling congressional direction that the state statute be pre-empted.

I believe this conclusion to be applicable to a case where a State alters the balance struck by Congress by conferring a benefit on a broadly defined class of citizens rather than by

regulating more explicitly the conduct of parties to a labor-management dispute. The crucial inquiry is whether the exercise of state authority "frustrate[s] effective implementation of the Act's processes," not whether the State's purpose was to confer a benefit on a class of citizens. I therefore see no basis for determining the question "whether Congress, explicitly or implicitly, has ruled out such assistance in its calculus of laws regulating labor-management disputes," *Super Tire*, 416 U. S., at 124, other than in the very manner set out in *Machinists* in the evaluation of the more direct regulation of labor-management relations at issue in that case.

Nor do I agree that we should depart from the principles of *Machinists* on the ground that "our cases have consistently recognized that a congressional intent to deprive the States of their power to enforce such general laws is more difficult to infer than an intent to pre-empt laws directed specifically at concerted activity." *Ante*, at 533. The Court recognized in *Garmon*, 359 U. S., at 244, that it has not "mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations." See *Sears, Roebuck & Co.* v. *Carpenters*, 436 U. S. 180, 193–195, and n. 24 (1978); *Farmer* v. *Carpenters*, 430 U. S. 290, 296–301 (1977). It is true, of course, that the Court has also recognized an exception to the *Garmon* principle and "allowed a State to enforce certain laws of general applicability even though aspects of the challenged conduct were arguably prohibited" where, for example, "the Court has upheld state-court jurisdiction over conduct that touches 'interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.' " *Sears*, 436 U. S., at 194–195, quoting *Garmon*, 359 U. S., at 244. But as the cases make clear, the Court has not extended this exception beyond a limited number of state interests that are at the core of the States' duties

and traditional concerns. See, *e. g., Youngdahl* v. *Rainfair, Inc.,* 355 U. S. 131 (1957) (violence); *Linn* v. *Plant Guard Workers,* 383 U. S. 53 (1966) (libel); *Farmer* v. *Carpenters, supra* (intentional infliction of mental distress). I do not think the New York statute here at issue fits within the pre-emption exception carved out by those cases, and I therefore would not apply the requirement, found in those cases, that "compelling congressional direction" be established before pre-emption can be found.

In summary, in the adjudication of this case, I would not depart from the path marked out by the Court's decision in *Machinists.* Because, however, I believe the evidence justifies the conclusion that Congress has decided to permit New York's unemployment compensation law, notwithstanding its impact on the balance of bargaining power, I concur in the Court's judgment.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE STEWART join, dissenting.

The Court's decision substantially alters, in the State of New York, the balance of advantage between management and labor prescribed by the National Labor Relations Act (NLRA). It sustains a New York law that requires the employer, after a specified time, to pay striking employees as much as 50% of their normal wages. In so holding, the Court substantially rewrites the principles of pre-emption that have been developed to protect the free collective bargaining which is the essence of federal labor law.

I

*The Policy of Free Collective Bargaining*

Free collective bargaining is the cornerstone of the structure of labor-management relations carefully designed by Congress when it enacted the NLRA. Of the numerous actions that labor or management may take during collective bargaining

to bring economic pressure to bear in support of their respective demands, the NLRA protects or prohibits only some. The availability and usefulness of many others depend entirely upon the relative economic strength of the parties.[1]

What Congress left unregulated is as important as the regulations that it imposed. It sought to leave labor and management essentially free to bargain for an agreement to govern their relationship.[2] Congress also intended, by its limited regulation, to establish a fair balance of bargaining power. That balance, once established, obviates the need for substantive regulation of the fairness of collective-bargaining agreements: whatever agreement emerges from bargaining between fairly matched parties is acceptable.[3] Thus, the NLRA's regulations not only are limited in scope but also must be viewed as carefully chosen to create the congressionally desired balance in the bargaining relationship. As the Court observed in *Motor Coach Employees* v. *Lockridge*, 403 U. S. 274, 286 (1971), the primary impetus for enactment of "a comprehensive national labor law" was the need to stabilize labor relations by "equitably and delicately structuring the balance of power among competing forces so as to further the common good." [4]

---

[1] See *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132, 134–135, 140–148 (1976).

[2] The tension between the value of freedom of contract and the legal ordering of the collective-bargaining relationship is discussed in H. Wellington, Labor and the Legal Process, ch. 2 (1968).

[3] See NLRA § 8 (d), 29 U. S. C. § 158 (d); *Porter Co.* v. *NLRB*, 397 U. S. 99, 102–104 (1970); *Teamsters* v. *Oliver*, 358 U. S. 283, 295–296 (1959); *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 45 (1937).

[4] "An appreciation of the true character of the national labor policy expressed in the [NLRA] indicates that in providing a legal framework for union organization, collective bargaining, and the conduct of labor disputes, Congress struck a balance of protection, prohibition, and laissez faire in respect to union organization, collective bargaining, and labor disputes that would be upset if a state could also enforce statutes or rules of decision resting upon its views concerning accommodation of the same

Because the NLRA's limits represent a clear congressional choice with respect to the freedom and fairness of the bargaining process, the Court has been alert to prevent interference with collective bargaining that is unwarranted by the NLRA. For example, in *NLRB* v. *Insurance Agents,* 361 U. S. 477 (1960), the Court rejected the conclusion of the National Labor Relations Board (Board) that certain on-the-job conduct undertaken by employees to support their bargaining demands was inconsistent with the union's duty to bargain in good faith. The Court, noting that the NLRA did not prohibit such actions, *id.,* at 498, concluded that allowing the Board to regulate the availability of such economic weapons would intrude on the area deliberately left unregulated by Congress.[5]

The Court employed the same analysis in reversing the Board's determination that the NLRA was violated by a lockout conducted to bring economic pressure to bear in support of the employer's bargaining position. *American Ship Building Co.* v. *NLRB,* 380 U. S. 300, 308 (1965). It rejected the Board's suggestion that, in enforcing the employer's duty to bargain in good faith, the Board could deny to the employer the use of certain economic weapons not otherwise proscribed by § 8.

> "While a primary purpose of the National Labor Relations Act was to redress the perceived imbalance of economic power between labor and management, it sought

interests." Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1352 (1972).

[5] The Court stated:

"[I]f the Board could regulate the choice of economic weapons that may be used as part of collective bargaining, it would be in a position to exercise considerable influence upon the substantive terms on which the parties contract. . . . Our labor policy is not presently erected on a foundation of government control of the results of negotiations. . . . Nor does it contain a charter for the [Board] to act at large in equalizing disparities of bargaining power between employer and union." 361 U. S., at 490.

to accomplish that result by conferring certain affirmative rights on employees and by placing certain enumerated restrictions on the activities of employers. . . . Having protected employee organization in countervailance to the employers' bargaining power, and having established a system of collective bargaining whereby the newly coequal adversaries might resolve their disputes, the Act also contemplated resort to economic weapons should more peaceful measures not avail. [The NLRA does] not give the Board a general authority to assess the relative economic power of the adversaries in the bargaining process and to deny weapons to one party or the other because of its assessment of that party's bargaining power." 380 U. S., at 316–317.

The States have no more authority than the Board to upset the balance that Congress has struck between labor and management in the collective-bargaining relationship. "For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits." *Garner* v. *Teamsters,* 346 U. S. 485, 500 (1953). In *Teamsters* v. *Morton,* 377 U. S. 252, 259–260 (1964), the Court held that a state law allowing damages for peaceful secondary picketing was pre-empted because "the inevitable result [of its application] would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy." *Id.,* at 259–260. The Court followed the same approach in *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S. 132 (1976), where it held pre-empted a state law under which the union had been enjoined from a concerted refusal to work overtime. Its prior decisions, the Court concluded, indicated that such activities, "whether of employer or employees, were not to be regulable by States any

more than by the NLRB, for neither States nor the Board is 'afforded flexibility in picking and choosing which economic devices of labor and management shall be branded as unlawful.' " *Id.*, at 149, quoting *NLRB* v. *Insurance Agents, supra,* at 498.

## II

### *Free Collective Bargaining and the New York Statute*

The plurality's opinion, after acknowledging that the payment of benefits financed ultimately by the employer was "a substantial factor" in the employees' decision to strike and remain on strike, *ante*, at 525, further concedes—as it must—that the New York law "has altered the economic balance" between management and labor. *Ante*, at 532. During the strike out of which the present controversy arose, the petitioners' employees collected more than $49 million in unemployment compensation. All but a small fraction of these benefits were paid from the petitioners' accounts in the New York unemployment insurance fund; because of these payments, the petitioners' tax rates were increased in subsequent periods.[6] The challenged provisions of the New York statute thus had a "twofold impact" on the bargaining process (*ante,*

---

[6] Petitioner TELCO's employees collected $43 million in compensation. Of this amount, approximately $40 million was paid from TELCO's account in the unemployment insurance fund. 566 F. 2d 388, 390 (CA2 1977); 434 F. Supp. 810, 812–813 (SDNY 1977). The proportion of the $6 million in compensation paid to employees of the other petitioners from the accounts of their employers does not appear in the record. But the overall element of nonemployer financing of compensation is so small that the Court of Appeals simply stated that "New York's unemployment insurance system is financed entirely by employer contributions, so the cost of making these payments was borne by the struck employers." 566 F. 2d, at 391.

The petitioners' own tax rates are tied directly to the payments made to their employees by the so-called "experience rating system." Under that system, an employer's rate in any given period varies from the standard of 2.7% primarily according to the amount of benefits paid to its employees during prior periods. N. Y. Lab. Law § 581 (McKinney 1977 and Supp. 1978–1979).

at 526 n. 5, 531–532): they substantially cushioned the economic impact of the lengthy strike on the striking employees, and also made the strike more expensive for the employers.[7]

Nothing in the NLRA or its legislative history indicates that Congress intended unemployment compensation for strikers, let alone employer financing of such compensation, to be part of the legal structure of collective bargaining.[8] The New York law therefore alters significantly the bargaining balance prescribed by Congress in that law. The decision upholding it cannot be squared with *Morton* and *Machinists*,

---

[7] The impact of unemployment compensation for strikers on the collective-bargaining process could be reduced significantly if such payments were funded from general tax revenues. The disruptive effect also would be lessened, though not as markedly, if such payments were funded by the unemployment compensation tax but were not taken into account in calculating experience ratings of individual employers. New York has eschewed both of these middle paths, however, in favor of a system in which such payments are financed directly by the struck employer.

New York is not alone in the course it has chosen. Although New York and Rhode Island are the only States that provide unemployment compensation for all covered employees idled by a strike, a number of other States pay unemployment compensation to strikers under varying conditions. See *Grinnell Corp.* v. *Hackett*, 475 F. 2d 449, 457, and n. 7 (CA1), cert. denied, 414 U. S. 858 (1973); *Albuquerque-Phoenix Exp., Inc.* v. *Employment Security Comm'n*, 88 N. M. 596, 600–601, 544 P. 2d 1161, 1165–1166 (1975), appeal dismissed *sub nom. Kimbell, Inc.* v. *Employment Security Comm'n*, 429 U. S. 804 (1976); U. S. Dept. of Labor, Comparison of State Unemployment Insurance Laws 4–41 (1972). All of those States appear to fund such payments from the unemployment compensation taxes paid by employers and calculated under an experience rating system. Staff Study of House Committee on Ways and Means, Information Relating to Federal-State Unemployment Compensation Laws 2–3 (1974).

[8] At the time that Congress enacted the NLRA, unemployment compensation laws had been enacted in only five States, and only in Wisconsin had the State's program gone into operation, a year earlier. S. Rep. No. 628, 74th Cong., 1st Sess., 11 (1935). Wisconsin and three of the other States denied unemployment compensation to strikers. The New York law, with its limited provision for compensation to striking employees, would not pay any benefits for another two years. It is not at all remark-

where far less intrusive state statutes were invalidated because they "upset the balance of power between labor and management expressed in our national labor policy." *Morton,* 377 U. S., at 260.[9]

The plurality's opinion seeks to avoid this conclusion by ignoring the fact that the petitioners are not challenging the entire New York unemployment compensation law but only that portion of it that provides for benefits for striking employees. Although the plurality characterizes the State's unemployment compensation law as "a law of general applicability" that "implement[s] a broad state policy that does not primarily concern labor-management relations," *ante,* at 533, 534, this description bears no relation to reality when applied to the challenged provisions of the law. Those provisions are "of general applicability" only if that term means—contrary to what the plurality itself says—generally applicable only to labor-management relations. It would be difficult to think of a law more specifically focused on labor-management relations than one that compels an employer to finance a strike against itself.[10]

Even if the challenged portion of the New York statute properly could be viewed as part of a law of "general applica-

able, therefore, that Congress overlooked the subject of unemployment compensation for strikers under these novel state programs during its consideration of the NLRA. Nor did Congress discuss the subject during its deliberations on the Social Security Act, which deals directly with state unemployment compensation programs. See Part III, *infra.*

[9] The State's adjustment of the relative economic strength of the parties to the collective-bargaining relationship is equally effective, and equally disruptive of the balance established by the NLRA, whether it takes the form of restricting or supporting a party's activities in furtherance of its bargaining demands.

[10] This assessment and readjustment of the collective-bargaining relationship by the state legislature is especially obvious in the challenged New York statute, which contains a special eligibility rule requiring strikers to wait seven weeks longer than other unemployed workers before collecting compensation. See *ante,* at 523 n. 3.

bility," this generality of the law would have little or nothing to do with whether it is pre-empted by the NLRA. A state law with purposes and applications beyond the area of industrial relations nonetheless may impinge upon congressional policy when it is applied to the collective-bargaining relationship.[11] The Court has recognized accordingly that pre-emption must turn not on the generality of purpose or applicability of a state law but on the effect of that law when applied in the context of labor-management relations. The "crucial inquiry regarding pre-emption" is whether the application of the state law in question " 'would frustrate effective implementation of the [NLRA's] processes.' " *Machinists*, 427 U. S., at 147–148, quoting *Railroad Trainmen* v. *Jacksonville Terminal Co.*, 394 U. S. 369, 380 (1969). As the Court stated in *Farmer* v. *Carpenters*, 430 U. S. 290, 300 (1977):

> "[I]t is well settled that the general applicability of a state cause of action is not sufficient to exempt it from pre-emption. '[I]t [has not] mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations.' *Garmon*, 359 U. S., at 244. Instead, the cases reflect a balanced inquiry into such factors as the nature of the federal and state interests in regulation and the potential for interference with federal regulation." (Footnote omitted.)

Accord, *Sears, Roebuck & Co.* v. *Carpenters*, 436 U. S. 180, 193, and n. 22 (1978). It is self-evident that the "potential [of the New York law] for interference" (*Morton, supra,* at

---

[11] In reviewing the history of the analogous decisions on the pre-emption of state-court jurisdiction, the Court has observed that "some early cases suggested the true distinction lay between judicial application of general common law, which was permissible, as opposed to state rules specifically designed to regulate labor relations, which were pre-empted," but that this approach had been unsatisfactory. *Motor Coach Employees* v. *Lockridge*, 403 U. S. 274, 290–291 (1971).

260) with the federally protected economic balance between management and labor is direct and substantial.[12]

The Court has identified several categories of state laws whose application is unlikely to interfere with federal regulatory policy under the NLRA. *Farmer* v. *Carpenters, supra,* at 296–297. Mr. Justice Frankfurter described one of these categories in broad terms in *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 243–244 (1959):

> "[States retain authority to regulate] where the regulated conduct touche[s] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act."

The plurality, attempting to draw support from the foregoing generalization, mistakenly treats New York's requirement that employers pay benefits to striking employees as state action "deeply rooted in local feeling and responsibility." [13] But

[12] The District Court found that the availability of unemployment compensation had a significant effect on the willingness of the petitioners' employees to remain on strike.

"Notwithstanding the State's adamant position to the contrary, I regard it as a fundamental truism that the availability to, or expectation or receipt of a substantial weekly tax-free payment of money by, a striker is a substantial factor affecting his willingness to go on strike or, once on strike, to remain on strike, in the pursuit of desired goals. This being a truism, one therefore would expect to find confirmation of it everywhere. One does." 434 F. Supp., at 813–814.

The Court of Appeals accepted this finding by the District Court. 566 F. 2d, at 390. The plurality's opinion, as already noted, *supra,* at 555–556, also accepts without question the District Court's findings on this point.

[13] The plurality supports this approach to the New York law by reference to the Social Security Act, which commits to the States broad control over eligibility requirements for unemployment compensation. This aspect of the Social Security Act, the plurality concludes, makes it

"appropriate to treat New York's statute with the same deference that we have afforded analogous state laws of general applicability that protect interests 'deeply rooted in local feeling and responsibility.' With respect

560

the broad language from *Garmon* has been applied only to a narrow class of cases. In *Garmon,* Mr. Justice Frankfurter identified, as typical of the kind of state law that would not be pre-empted, "the traditional law of torts." *Id.,* at 247; cf. *id.,* at 244 n. 2. The Court has adhered to this understanding of the "local feeling and responsibility" exception formulated in *Garmon.* See *Machinists,* 427 U. S., at 136, and n. 2 ("Policing of actual or threatened violence to persons or destruction of property has been held most clearly a matter for the States"); *id.,* at 151 n. 13; *Farmer* v. *Carpenters, supra,* at 296–300; cf. *Sears, supra,* at 194–197. The provisions of the New York law at issue here have nothing in common with the state laws protecting against personal torts or violence to property that have defined the "local feeling and responsibility" exception to pre-emption.

## III

### *The Lack of Evidence of Congressional Intent to Alter the Policy of the NLRA*

The challenged provisions of the New York law cannot, consistently with prior decisions of this Court, be brought within the "local feeling and responsibility" exception to the pre-emption doctrine. The principles of *Morton* and *Machinists* therefore require pre-emption in this case unless in some other law Congress has modified the policy of the NLRA. The plurality, acknowledging the need to look beyond the NLRA to support its conclusion, relies primarily on the Social Security Act. In that Act, adopted only five weeks after the passage of the NLRA, it finds an indication that Congress did intend that the States be free to make unemployment compensation payments part of the collective-bargaining relation-

---

to such laws, we have stated 'that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act,' *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 244." *Ante,* at 539–540.

ship structured by the NLRA. But it is extremely unlikely that little over a month after enacting a detailed and carefully designed statute to structure industrial relations, the Congress would alter so dramatically the balance struck in that law. It would be even more remarkable if such a change were made, as the plurality suggests, without any explicit statutory expression, and indeed absent any congressional discussion whatever of the problem.

The Social Security Act, as the plurality acknowledges, *ante,* at 540, is silent on the question, neither authorizing the States to provide unemployment compensation for strikers nor prohibiting the States from making such aid available. Congress did explicitly forbid the States to condition unemployment compensation benefits upon acceptance of work as strikebreakers, or membership in a company union, or nonmembership in any labor union,[14] thereby indicating an intention to prohibit interference with the collective-bargaining balance struck in the NLRA.

Nor does the legislative history of the Social Security Act reflect any congressional intention to allow unemployment compensation for strikers.[15] Senator Wagner, a sponsor of

---

[14] To qualify under federal law, a State's unemployment compensation program must, among other things, provide that:

"(5) compensation shall not be denied in such State to any otherwise eligible individual for refusing to accept new work under any of the following conditions:

"(A) if the position offered is vacant due directly to a strike, lockout, or other labor dispute;

.          .          .          .          .

"(C) if as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona fide labor organization." Social Security Act § 903 (a) (5), 49 Stat. 640, 26 U. S. C. § 3304 (a) (5).

[15] The Court of Appeals for the First Circuit, after reviewing the legislative history, also concluded that "unambiguous Congressional intent is lacking" regarding the authorization of state unemployment compensation for striking employees. *Grinnell Corp.* v. *Hackett,* 475 F. 2d, at 457. As

the proposed legislation, made no reference to any such feature of the Social Security Act in his remarks to the Senate Finance Committee. Hearings on S. 1130 before the Senate Committee on Finance, 74th Cong., 1st Sess., 1–30 (1935).[16] Although the suggestion that the Act should contain an explicit prohibition of unemployment compensation to strikers was included in several written submissions to the Senate Committee, there is no evidence whatever that the Committee considered the suggestion.[17]    Indeed, it is clear that the prob-

---

one commentator has concluded, "the absence of legislation and the absence of any discussion in the committee reports relating to this legislation are indicative [that] Congress did not anticipate in detail the problems which would arise when workers claimed benefits when their own unemployment was related either directly or indirectly to a labor dispute." Haggart, Unemployment Compensation During Labor Disputes, 37 Neb. L. Rev. 668, 674 (1958).

[16] The plurality also finds support for its holding by noting that Senator Wagner, a principal sponsor of both the NLRA and the Social Security Act, was familiar with New York's unemployment compensation law, and that the Senate Report on the Social Security bill—in the portion thereof discussing the States' freedom of choice with respect to such laws—expressly mentioned the New York statute as an example.   The plurality's opinion then reasons:

"Even though that reference [in the Senate Report] did not mention the subject of benefits for strikers, it is difficult to believe that Senator Wagner and his colleagues were unaware of such a controversial provision . . . ." *Ante,* at 541–542.

I agree with the plurality that any provision for unemployment compensation for strikers would have been controversial.   Indeed, it strains credulity to think that the entire Congress and the scores of witnesses who testified with respect to this legislation ignored so controversial an issue.   On a question of this importance, especially in its relation to the NLRA, there would have been hearings, testimony, lobbying, and debate.   I am unwilling to assume that Senator Wagner was "aware of [this] controversial provision" and elected to avoid, by remaining silent, the normal democratic processes of legislation.   In any event, the unexpressed awareness of Senator Wagner hardly can be imputed to other Members of the Congress.

[17] Contrary to the implication in the plurality's opinion, *ante,* at 543 n. 41, Mr. Witte, the Executive Director of the President's Committee on

lem never received congressional attention, for the subject is mentioned nowhere in the Committee Reports or the congressional debates on the Social Security Act. H. R. Rep. No. 615, 74th Cong., 1st Sess. (1935); S. Rep. No. 628, 74th Cong., 1st Sess. (1935); 79 Cong. Rec. 5467–5478, 5528–5563, 5579–5606, 5678–5715, 5768, 5771–5817, 5856–5909, 5948–5994, 6037–6068, 9191, 9267–9273, 9282–9297, 9351–9362, 9366, 9418–9438, 9440, 9510–9543, 9625–9650, 11320–11343 (1935).[18]

Economic Security, did not recommend withholding benefits from strikers during a strike. The issue of unemployment compensation for strikers never arose during Mr. Witte's testimony. The plurality's reference is to a Report of the Advisory Council to the Committee on Economic Security, a group of 23 "laymen" assembled to "give practical advice to the committee [on Economic Security]." Hearings on S. 1130, at 225. See H. R. Rep. No. 615, 74th Cong., 1st Sess., App. (1935). Mr. Witte did not appear before the Senate Committee to support the report of the Advisory Council, and placed it in the record only at the request of the Senate Committee. The Report of the Committee on Economic Security did not refer to or comment on the subject of compensation for strikers, except perhaps indirectly in its statement that "[t]o serve its purposes, unemployment compensation must be paid only to workers involuntarily unemployed." Report of the President's Committee on Economic Security 21 (1935).

Similarly, the question of compensation for striking workers did not arise during the examination of the other two witnesses whose written submissions included suggestions that the Social Security Act should contain an explicit disqualification of strikers. See Hearings on S. 1130, *supra,* at 458–478, 919–959. The Court should be "extremely hesitant to presume general congressional awareness" of the issue of unemployment compensation for strikers "based only upon a few isolated statements in the thousands of pages of legislative documents." *SEC* v. *Sloan,* 436 U. S. 103, 121 (1978).

[18] Subsequent congressional inaction does not demonstrate an understanding that the Social Security Act modified the NLRA to allow payment of unemployment compensation to strikers. See *ante,* at 544–545, and n. 44. As the plurality acknowledges, *ibid.,* the 1947 Conference Committee gave no reason for its rejection of an amendment to the NLRA that would have excluded strikers from the statute's coverage if they collected unemployment compensation. The Committee may have decided that the amend-

Faced with the absence of any specific indications in the Social Security Act or its legislative history that Congress intended for the States to have the authority to upset the NLRA's collective-bargaining relationship by paying compensation to strikers, the plurality relies on the general policy embodied in the Social Security Act of leaving to the States the determination of eligibility requirements for compensation. *Ante*, at 537–538, 542, and n. 42.[19] That policy sup-

---

ment was redundant, and so not worth the controversy it might provoke if included in the final bill sent to Congress: the House Report approving the amendment had stated that it was recommended to halt the "perversion" of the purposes of social security legislation. H. R. Rep. No. 245, 80th Cong., 1st Sess., 12 (1947). The comments in 1969 of a single Congressman, delivered long after the original passage of the Social Security Act, are of no aid in determining congressional intent on this matter.

[19] The plurality also cites the Railroad Unemployment Insurance Act (RUIA) and the Food Stamp Act, as evidence that Congress intended to allow the States to require employers to finance unemployment compensation to their striking employees. See *ante*, at 544–545, n. 44. These statutes are simply irrelevant to the question raised by this case. The RUIA, together with the Railway Labor Act, is part of a special system of labor-management relations separate and distinct from the general structure established in the NLRA. The availability of unemployment compensation for strikers within the jurisdiction of the RUIA is conditioned upon their compliance with restrictions on the right to strike that are much more onerous than those imposed by the NLRA. See *Detroit & Toledo Shore Line R. Co.* v. *Transportation Union*, 396 U. S. 142, 148–153 (1969); *Railway & Steamship Clerks* v. *Railroad Retirement Bd.*, 99 U. S. App. D. C. 217, 222–223, 239 F. 2d 37, 42–43 (1956).

Unlike unemployment compensation, which is linked only to an interruption in the employee's income, food stamps and other general welfare programs are available only when income *and* assets have become insufficient to supply necessities. See, *e. g.*, 7 U. S. C. § 2014 (a) (1976 ed., Supp. III) ("Participation in the food stamp program shall be limited to those households whose incomes and other financial resources . . . are determined to be a substantial limiting factor in permitting them to obtain a more nutritious diet"). Such welfare programs are funded out of general revenues rather than by taxes levied on the employers of those using the stamps. Moreover, when 7 U. S. C. § 2014 (c) was amended in 1977, the Congress

ports the narrow interpretation of the few conditions on eligibility imposed on the States by the Social Security Act itself. *Ohio Bureau of Employment Services* v. *Hodory,* 431 U. S. 471, 475 n. 3, 482–489 (1977). But there is no indication in that Act or its legislative history that Congress thought that this general policy relieved the States of constraints imposed by other federal statutes such as the NLRA.[20] In particular, it would be difficult indeed to infer from this feature of the Act that Congress intended to leave the States free to require employers to fund unemployment compensation for their striking employees without regard to the effect on the bargaining relationship structured by the NLRA.

The plurality holds, nonetheless, that New York may require employers to pay unemployment compensation to strikers amounting to some 50% of their average wage. Nothing in the plurality's opinion, moreover, limits such compensation to 50% of average wages, for the plurality indicates that the Social Security Act gives the States complete control over this aspect of their unemployment compensation programs. Accordingly, New York and other States are free not only to increase compensation to 100% but also to eliminate the waiting period now imposed on striking employees.[21] The plurality's

---

deleted the proviso that "[r]efusal to work at a plant or site subject to a strike or a lockout for the duration of such strike or lockout shall not be deemed to be a refusal to accept employment." See 7 U. S. C. § 2014 (c) (1976 ed., Supp. III).

[20] Cf. *Nash* v. *Florida Industrial Comm'n,* 389 U. S. 235, 239 (1967) (eligibility requirement in the State's unemployment compensation law, interfering with NLRA's policy of protection for employees filing unfair labor practice charges with the Board, held pre-empted).

[21] The Solicitor General would escape this implication of the plurality's construction of the Social Security Act by concluding that at some point between 50% and 100% of weekly wages, or between an 8-week waiting period and none at all, the policy of the Social Security Act would give way to that of the NLRA.

"It is unnecessary to determine in this case the ultimate scope of the states' freedom to make payments to strikers that may intrude on or dis-

sweeping view of the Act thus lays open the way for any State to undermine completely the collective-bargaining process within its borders.

A much more cautious approach to implied amendments of the NLRA is required if the Court is to give proper effect to the legislative judgments of the Congress. Having once resolved the balance to be struck in the collective-bargaining relationship, and having embodied that balance in the NLRA, Congress should not be expected by the Court to reaffirm the balance explicitly each time it later enacts legislation that may touch in some way on the collective-bargaining relationship. Absent explicit modification of the NLRA, or clear inconsistency between the terms of the NLRA and a subsequent statute, the Court should assume that Congress intended to leave the NLRA unaltered.[22] This assumption is especially

---

rupt the collective bargaining process. . . . For example, a statute requiring an employer to pay its employees—through the state unemployment compensation system—100 percent of wages from the beginning of a strike to the end would appear to be so far beyond the focus of the Social Security Act and so destructive of the principles of the NLRA as to be beyond the contemplation of Congress in permitting some freedom of choice to the states." Brief for United States as *Amicus Curiae* 25 n. 25.

But the Solicitor General is no more successful in identifying the source of this limitation on the modification of the NLRA by the Social Security Act than is the plurality in identifying the source of the modification itself. The plurality refrains from compounding insupportable inferences, apparently accepting instead the open-ended implications of its conclusion that New York is free to pay such unemployment benefits to strikers as it desires.

[22] See *Malone* v. *White Motor Corp.*, 435 U. S. 497, 515–516 (1978) (STEWART, J., dissenting) ("I do not believe, however, that inferences drawn largely from what Congress did *not* do in enacting the Disclosure Act are sufficient to override the fundamental policy of the national labor laws to leave undisturbed 'the parties' solution of a problem which Congress has required them to negotiate in good faith toward solving . . . .' *Teamsters* v. *Oliver*, 358 U. S. 283, 296"). This Court has often stated that implied repeals and modifications of statutes by subsequent congres-

appropriate in considering the intent of Congress when it enacted the Social Security Act just five weeks after completing its deliberations on the NLRA.

## IV

The effect of the New York statute is to require an employer to pay a substantial portion of the wages of employees who are performing no services in return because they have voluntarily gone on strike. This distorts the core policy of the NLRA—the protection of free collective bargaining. Whether that national policy should be subject to such substantial alteration by any state legislature is a decision that the Congress should make after the plenary consideration and public debate that customarily accompany major legislation. The financing of striking employees by employers under unemployment compensation systems such as that of New York has never received any such consideration by Congress. The Court today, finding nothing in any statute, congressional committee report, or debate that indicates any intention to allow States to alter the balance of collective bargaining in this major way, rests its decision on inferences drawn from only the most fragmentary evidence.

I would hold, as it seems to me our prior decisions compel, that the New York statute contravenes federal law. It would then be open to the elected representatives of the people in Congress to address this issue in the way that our system contemplates.

---

sional enactments are justified only when the two statutes are otherwise irreconcilable. *Morton* v. *Mancari,* 417 U. S. 535, 550 (1974); *United States* v. *Welden,* 377 U. S. 95, 103 n. 12 (1964); *United States* v. *Borden Co.,* 308 U. S. 188, 198–199 (1939); cf. *Bulova Watch Co.* v. *United States,* 365 U. S. 753, 758 (1961) (a specific statute controls over a general one without regard to priority of enactment).