Ex parte Chester B. HOVERMALE, Relator.

No. 04–82–00017–CV.

Court of Appeals of Texas, San Antonio.

June 30, 1982.

Michael N. Nye, San Antonio, for appellant.

Gary A. Beahm, San Antonio, for appellee.

## OPINION

CANTU, Justice.

Relator was confined pursuant to a commitment order issued by the 285th Judicial District Court of Bexar County after sustaining a Motion for Contempt upon a finding that relator had violated a previous order of the court entered on October 30, 1979, in Cause No. 78–CI–13387, styled Elizabeth M. Hovermale v. Chester B. Hovermale, requiring relator to pay to his former wife a portion of his gross monthly military retirement pay, based on a formula set out in the decree of divorce. Relator has filed this original habeas corpus proceeding and this court, acting en banc, ordered his release upon the posting of bail.

Due to a conflict in positions taken by different panels of this Court in *Ex parte Buckhanan*, 626 S.W.2d 65 (Tex.App.—San Antonio 1981, no writ) and *Ex parte Rodriguez*, 636 S.W.2d 844 (Tex.App.1981), we

now act en banc. After exhaustive consideration of relator's application, we decline his request for relief, and we remand him to the custody of the Sheriff of Bexar County.

Relator and his spouse were divorced on October 30, 1979, and an order partitioning property, including U.S. Postal Service retirement and U.S. Navy military retirement, was entered awarding both parties a portion of each retirement fund based upon a formula incorporated in the decree. In each case relator was constituted a trustee for the benefit of his ex-spouse in all sums received by him for her benefit. Only the military retirement benefits were alleged to be the subject matter of the contempt motion and, accordingly, the U.S. Postal Service retirement benefits are not involved in this case.

On January 6, 1982, the trial court found that relator had violated the order of October 30, 1979, by failing to pay any portion of his military retirement benefits to his ex-spouse for the months of July through December of 1981, in the total amount of $1,400.47. As in *Ex parte Buckhanan, supra,* and *Ex parte Rodriguez, supra,* relator contends that the portion of his divorce decree ordering a division of the military retirement benefits is void because of the United States Supreme Court's holding in *McCarty v. McCarty,*[1] and subsequent case law. Reliance is principally placed upon *Trahan v. Trahan,* 626 S.W.2d 485 (Tex. 1981), *Ex parte Johnson,* 591 S.W.2d 453 (Tex.1979) and *Ex parte Buckhanan, supra.*

Numerous courts have attempted to resolve the question of retroactive application following the *McCarty* decision.[2] Some

have attempted to find consolation in the doctrine of res judicata while others prefer to repose behind a theory of "vanishing" jurisdiction. Most courts recognize that the problem arises from references in the *McCarty* decision to the preemption doctrine. We believe that the solution lies in the definition ascribed to the term "preemption" and demarcating situations where "preemption" applies.

## PREEMPTION AND THE SUPREMACY CLAUSE

There is much confusion surrounding the term "preemption." Even some opinions of the U.S. Supreme Court contribute to this confusion by using the term to include all situations dealing with the Supremacy Clause. However, a survey of cases by the U.S. Supreme Court dealing with preemption and the Supremacy Clause[3] indicates distinct differences in application, reasoning and, presumably, results in subsequent cases.

The term "preemption" has traditionally been reserved to connote those instances in which Congress has expressly issued a peremptory prohibition of the states' exercise of jurisdiction over certain subject matter, as in bankruptcy, where its power is plenary. *See Kalb v. Feuerstein,* 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940). Consequently, when a federal statute has vested exclusive jurisdiction of a particular type of case in the federal courts, the finding by a state court that it has jurisdiction over such a case will not preclude a collateral attack upon the judgment rendered in the state court. This is so because in speaking out, Congress has expressly stated that state

1. 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981).

2. *Wilson v. Wilson,* 667 F.2d 497 (5th cir. 1982); *Erspan v. Badgett,* 647 F.2d 550 (5th Cir. 1981), reh. en banc denied with opinion, 659 F.2d 26; *Trahan v. Trahan,* 626 S.W.2d 485 (Tex.1981); *Ex parte Welch,* 633 S.W.2d 691 (Tex.App.—Eastland 1982); *Ex parte Gaudion,* 628 S.W.2d 500 (Tex.App.—Austin, 1982); *Ex parte Rodriguez,* 636 S.W.2d 844 (Tex.App. 1981); *Ex parte Buckhanan,* 626 S.W.2d 65

(Tex.App.—San Antonio 1981); *Ex parte Acree,* 623 S.W.2d 810 (Tex.App.—El Paso, 1981); *Fellers v. Fellers,* 125 Cal.App.3d 254, 178 Cal.Rptr. 35 (1981); *Sheldon v. Sheldon,* 124 Cal.App.3d 371, 177 Cal.Rptr. 380 (1981); *Mahone v. Mahone,* 123 Cal.App.3d 17, 176 Cal.Rptr. 274 (1981); *Erbe v. Eady,* 406 So.2d 936 (Ala.Civ. App.1981); *Braden v. Reno,* (Idaho Dist.Ct. 4th Dist., Nov. 3, 1981) 8 Fam.L.R. (BNA) 2041.

3. U.S.Const. art. VI, cl. 2.

courts are not to venture into a prohibited area, and in doing so, they run the risk of having their rulings declared nullities.

■ The term "preemption" has likewise been used in connection with instances in which Congress enters into an area of law not expressly reserved unto it and which is, perhaps, already occupied by state legislation as interpreted by long-standing state jurisprudence. It is not unusual for the U.S. Supreme Court to characterize this problem as falling under the mantle of the Supremacy Clause and often express the opinion that Congress has preempted the field. While the use of the term preemption in this context may be technically correct, the Court has often elected to refer to Congress' actions as "overriding" and "superseding" action by a State, and state *regulation* in the area is said to "give way" and "become inoperative." Thus preemption occurs through judicial interpretation and application of the Supremacy Clause.[4]

■ In the final analysis, it seems clear that the term "preemption" does not always imply a prohibition and, therefore, a withholding of jurisdiction or authority to act.

A third type of preemption has been recognized, and perhaps it is in this area that the greatest difficulties have arisen. Our attention must focus upon this type of preemption because it is from this area that *McCarty* derives its vitality.

■ In 1962 the U.S. Supreme Court, in the case of *Free v. Bland*, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180, was called upon to decide whether treasury regulations preempted inconsistent Texas community property law by virtue of the Supremacy Clause of the U.S. Constitution. The Court held that the survivorship provision of the regulations *conflicted* with state law. In doing so the Court recognized two types of preemption. The first arises where the federal statute's language expressly or implicitly reflects the command of Congress. 369

U.S., at 670, 82 S.Ct., at 1094, 8 L.Ed.2d, at 185. The second arises where state law and federal laws are so inconsistent that the state law must give way because *it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.* 369 U.S., at 666, 82 S.Ct., at 1092, 8 L.Ed.2d, at 183.

At the next term, the Court in *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), with all nine justices adopting the *Hines v. Davidowitz* test,[5] spoke in similar terms. *See also Yiatchos v. Yiatchos*, 376 U.S. 306, 84 S.Ct. 742, 11 L.Ed.2d 724 (1964). More recently in *DeCanas v. Bica*, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), the Court considered whether a state statute was unconstitutional because it stood as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the federal statute. 424 U.S., at 363, 96 S.Ct., at 940, 47 L.Ed.2d, at 53.

Again, in *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), the Court considered whether Congress, pursuant to its powers granted by the U.S. Constitution, has prohibited the states from further operation in a field traditionally occupied by the states. Although the term "preempted" was again used by the Court, it is clear that the meaning ascribed to the term is one of "superseding" when the Court held

> But when Congress has "unmistakably ... ordained," [citation omitted] that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall .... Congressional enactments that do not exclude all state legislation in the same field nevertheless *override state laws* with which they conflict. (citations omitted) (emphasis added).

430 U.S., at 525–526, 97 S.Ct., at 1309–1310, 51 L.Ed.2d, at 614.

*See also Maurer v. Hamilton*, 309 U.S. 598, 60 S.Ct. 726, 84 L.Ed. 969 (1940).

---

4. "What is within exclusive federal authority may first have to be determined by this court to be so." *Amalgamated Clothing Workers of America v. Richman Brothers*, 348 U.S. 511, 516, 75 S.Ct. 452, 455, 99 L.Ed. 600, 608 (1954);

5. 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

In *Jones*, the Court recognized that even though federal law may not preempt state law in the traditional sense, state law may, nevertheless, have to yield because it stands as an obstacle to the accomplishment and execution of the full purposes of Congress. 430 U.S., at 540, 97 S.Ct., at 1317, 51 L.Ed.2d, at 623. *See also New York Tel. Co. v. New York Labor Dept.*, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979). As in *Free v. Bland, supra*, the Court stated, "Our task is to determine whether, under the circumstances of this particular case, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (citations omitted) 430 U.S., at 526, 97 S.Ct., at 1310, 51 L.Ed.2d, at 614.

The determination to be made in these cases is whether preemption occurs by virtue of decisional law and statutory construction as opposed to preemption by prohibition of Congress. *Jones v. Rath Packing Co., supra*, thus stands for the proposition that state interests may have to "give way" to federal interests even though preemption [6] in the usual sense has not taken place. Perhaps it is unfortunate that the Court continues to cling to the notion of preemption in its opinions instead of simply referring to an "overriding," "giving way" or "superseding" of state interests by federal law by virtue of the Supremacy Clause.[7]

We now turn our attention to *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979) and *McCarty v. McCarty, supra*. In *Hisquierdo* the Court held that Railroad Retirement Act benefits accrued during marriage are not community property subject to division upon divorce. In so doing, the Court stated the test to be applied as "whether the right as asserted conflicts with the express terms of federal law *and* whether its consequences sufficiently injure the objectives of the federal program

to require nonrecognition." (emphasis added) 439 U.S., at 583, 99 S.Ct., at 809, 59 L.Ed.2d, at 12. In holding as it did, the Court noted that the language in the Retirement Act positively required, by direct enactment, that state law be preempted and that the type of injury the Supremacy Clause seeks to prevent was threatened by community property interests in conflict with the Act. Thus, in *Hisquierdo*, there were both types of preemption. So here preemption occurred by virtue of both types alluded to in *Free v. Bland, supra. See also Wissner v. Wissner*, 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424 (1950).

In *McCarty v. McCarty, supra*, the Court, in holding that military retirement benefits may not be divided by state courts pursuant to community property laws, premised its holding upon the same considerations discussed in *Hisquierdo*. Unlike *Hisquierdo*, however, the Court in *McCarty* concluded that a mere conflict between federal and state interests did not invoke preemption under the Supremacy Clause, particularly where the conflict is only one of words. Reliance was then had upon the second type of preemption recognized in *Free v. Bland, supra*, to determine that continued recognition of the assailed state interest threatened grave harm to clear and substantial federal interests, 453 U.S. 231, 101 S.Ct., at 2741, 69 L.Ed.2d, at 606, potentially frustrated Congressional objectives, 453 U.S. 231, 101 S.Ct., at 2741, 69 L.Ed.2d, at 606, and interfered with a legitimate exercise of the power of the Federal Government. 453 U.S. 233, 101 S.Ct., at 2742, 69 L.Ed.2d, at 607. The same approach had been taken in the earlier case of *Farmers Ed. & Coop Union of America v. W Day, Inc.*, 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959).

Thus we may note that the decision in *McCarty* does not rest upon traditional con-

---

6. The court has recognized that the term preemption is capable of confusing application. *New York State Dept. of Social Services v. Dublino*, 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973) (note 9).

7. Note in *Hines v. Davidowitz, supra*, that the court recognizes the problem created by its use

of variant expressions when the real concern is simply the test of "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See also Perez v. Campbell*, 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233, 242 (1971).

cepts of preemption but rather upon that species of preemption calling for the "giving way," "overriding," "yielding to," and "superseding of" state interests because they stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Hisquierdo v. Hisquierdo, supra, Jones v. Rath Packing Co., supra; DeCanas v. Bica, supra; Florida Lime and Avocado Growers, Inc. v. Paul, supra; Free v. Bland, supra.* Since state action in the face of clear prohibitory language is void,[8] only those judicial acts exercised by state courts when the courts possessed jurisdiction, in the absence of Congressional or constitutional prohibition, and those judicial acts taken by state courts prior to Congressional overriding by judicial interpretation need concern themselves with the question of prospective or retroactive application.

The majority in *Ex parte Buckhanan, supra,* while recognizing that a final judgment, that is only erroneous and not beyond the power of the court to enter, cannot be collaterally attacked, citing *Humble Oil & Refining Co. v. Fisher,* 152 Tex. 29, 253 S.W.2d 656 (1952) and *Clayton v. Hurt,* 88 Tex. 595, 32 S.W. 876 (1895), nevertheless concludes that preemption under *McCarty* and *Hisquierdo* renders a judgment, otherwise final, void ab initio. The defect in the majority opinion in *Buckhanan* lies in its failure to recognize the different types of preemption under consideration in the various cases relied upon and, in lumping them together without distinction. By doing so, the opinion places all cases on an identical

footing and creates an inappropriate measuring device, thereby condemning all cases touched by the *McCarty* decision to a death and burial without benefit of autopsy.[9]

*Ex parte Johnson,* 591 S.W.2d 453 (Tex. 1979), also cited in *Buckhanan,* relies upon *Hisquierdo* -type preemption. If *Ex parte Johnson* indeed calls for retroactive application,[10] it is so only because of the type of preemption involved and upon which it relies and which by the very language of the statute involved declares a prohibition against state intervention. 591 S.W.2d, at 456.

Because state law was so firmly entrenched before the Court sounded the warning in *McCarty* that state interests must yield to Congressional objectives, there can be no contention that a clear prohibition existed rendering state intervention into a heretofore exclusive federal area a nullity. In declaring that Congress, by characterizing military retirement benefits as being the sole property of the retiree, preempted any state law characterization to the contrary, the *Buckhanan* majority disregards the core considerations in issue in *McCarty.*[11] So viewing the premise of the *Buckhanan* majority, it is easy to see how they erroneously concluded that the judgment was void ab initio. *See Kalb v. Feuerstein, supra.*

In *Kalb,* relied upon by the *Buckhanan* majority, the Court reaffirmed the general rule that a judgment by a court of competent jurisdiction bears a presumption

---

8. *See Kalb v. Feuerstein, supra.* There is authority, however, supporting the view that it is the *law* of the state in conflict with the U. S. Constitution which is declared to be repugnant and void. The decision of the lower court interpreting the interaction between state law and federal law can only be erroneous unless or until annulled. *See Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); *Sinnot v. Davenport,* 63 U.S. (22 How.) 227, 16 L.Ed. 243 (1859). Presumably this is so whether a court decision interprets state action enacted in the very face of constitutional prohibition. For purposes of our decision we need not concern ourselves with the distinction since in any event *McCarty* is not of this type of preemption.

9. If all cases are to be placed on an identical footing, we suggest that all judgments rendered in violation of any type of preemption be merely erroneous. *See Gibbons v. Ogden, supra, Sinnot v. Davenport, supra; Contra Kalb v. Feuerstein, supra.*

10. Although the case does not address retroactivity it does recognize the prohibitory language of the federal statute.

11. The El Paso Court of Appeals adopted the *Buckhanan* reasoning in *Ex parte Acree,* 623 S.W.2d 810 (Tex.App.—El Paso 1981).

of regularity and is not thereafter subject to collateral attack.[12] In doing so, the Court also recognized that judicial acts may be rendered nullities and vulnerable collaterally when a state court acts in an area peremptorily prohibited by Congress. In *Kalb*, a state court attempted to exercise jurisdiction in an area set aside to the bankruptcy courts by the U.S. Constitution through an act of Congress. Where state courts attempt to exercise jurisdiction where it has been expressly prohibited, their acts are without authority of law. This is not to say that jurisdiction once possessed and later superseded renders all prior acts void.

## JURISDICTION, FINALITY OF JUDGMENTS AND RES JUDICATA

On the subject of jurisdiction, a most respected legal writer has stated:

A court has jurisdiction of any subject-matter, if, by the law of its organization, it has authority to take cognizance of, try, and determine cases of that description. If it assumes to act in a case over which the law does not give it authority, the proceeding and judgment will be altogether void, and rights of property cannot be divested by means of them.

. . . .

Accordingly, where a court of law has no jurisdiction of the subject-matter of a controversy, a party whose rights are sought to be affected by it is at liberty to repudiate its proceedings and refuse to be bound by them, notwithstanding he may once have consented to its action, either by voluntarily commencing the proceedings as plaintiff, or as defendant by appearing and pleading to the merits, or by any other formal or informal action.

. . . .

. . . [T]o render the jurisdiction of a court effectual in any case, it is necessary that the thing in controversy, or the parties interested, be subjected to the process of the court.

. . . .

When it is once made to appear that a court has jurisdiction both of the subject matter and of the parties, the judgment which it pronounces must be held conclusive and binding upon the parties thereto and their privies, notwithstanding the court may have proceeded irregularly, or erred in its application of the law to the case before it. It is a general rule that irregularities in the course of judicial proceedings do not render them void.

W. Carrington, Cooley's Constitutional Limitations, Vol. II at 846, 851, 861 (8th ed. 1926) (footnotes omitted); *see also White v. Crow*, 110 U.S. 183, 4 S.Ct. 71, 28 L.Ed. 113 (1884).

In *Federated Department Stores v. Moitie*, 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981), decided barely eleven days before *McCarty*, the U. S. Supreme Court, without specifically referring to it, reaffirmed the holding in *White v. Crow, supra*, by stating:

A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Nor are the res judicata consequences of a final, unappealed judgment on the merits altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case. [citations omitted]. . . . [A]n "erroneous conclusion" reached by the court in the first suit does not deprive the defendants in the second action "of their right to rely upon the plea of res judicata. . . . A judgment merely voidable because based upon an erroneous view of the law is not open to collateral attack, but can be corrected only by a direct review and not by bringing another action upon the same cause of action." We have observed that "the indulgence of a contrary view would result in creating elements of uncertainty and confusion and in undermining the conclusive char-

12. *See also Chicot County Drainage District v. Baxter State Bank, infra; Stoll v. Gottlieb*, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938);

*Dowell v. Applegate*, 152 U.S. 327, 14 S.Ct. 611, 38 L.Ed. 463 (1894).

acter of judgments, consequences which it was the very purpose of the doctrine of res judicata to avert. *Reed v. Allen*, 286 U.S. 191, 201, 52 S.Ct. 532, 534, 76 L.Ed. 1054 (1932).

452 U.S., at 396–398, 101 S.Ct., at 2427–2428, 69 L.Ed.2d, at 108–109. Still further the court stated:

> This court has long recognized that "[p]ublic policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." *Baldwin v. Traveling Men's Association*, 283 U.S. 522, 525, 51 S.Ct. 517, 518, 75 L.Ed. 1244 (1931).

452 U.S. at 400, 101 S.Ct., at 2429, 69 L.Ed.2d, at 110–111.

The United States Court of Appeals for the Fifth Circuit, in a per curiam opinion, recently considered the holding in *Federated Department Stores, Inc. v. Moitie, supra*, as it applied to a *McCarty* situation. Finding nothing in *McCarty* suggesting that the Supreme Court intended to invalidate or otherwise render unenforceable prior valid and subsisting state court judgments, the appeals court declined to do so. *See Erspan v. Badgett*, 647 F.2d 550 (5th Cir. 1981) reh. en banc denied with opinion, 659 F.2d 26, 28.[13]

In *Wilson v. Wilson*, 667 F.2d 497 (5th Cir. 1982), the same court once again considered the question of retroactive application of *McCarty* and, considering itself bound by the holding in *Erspan v. Badgett, supra*,[14] applied the doctrine of res judicata to the final judgment being assailed. We, likewise, find nothing in the language of *McCarty*, nor in the reasons for preemption, nor in any of the opinions of our Supreme Court,[15] which mandates a retroactive appli-

cation of *McCarty* or a holding of voidness ab initio.

## RETROACTIVITY

In the absence of direction by the Court in *McCarty*, we are obliged to resolve the issue of retroactivity under appropriate guidelines. *See Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *see also Chevron Oil Company v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971); Annot., 65 L.Ed.2d 1219 (1981); Annot., 22 L.Ed.2d 821 (1970); Annot., 14 L.Ed.2d 992 (1966); Annot., 10 A.L.R.3d 1371 (1966).

Whether and to what extent an overruling case will be applied retroactively is a matter of judicial attitude, depending on the circumstances of the particular overruling decision involved. *Linkletter v. Walker, supra*. Where a decision could produce substantial inequitable results if applied retroactively, there is ample support in case law for avoiding the injustice or hardship by holding application of the law non-retroactive. *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); *Great Northern Railway Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). Insofar as the general principles of retroactive or prospective application of an overruling decision are concerned, no distinction is to be drawn between civil and criminal cases. *Linkletter v. Walker, supra*.

In *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940) the United States Supreme Court, recognizing the problems of retroactive application stated:

> The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot

---

13. Our Supreme Court in *Trahan v. Trahan*, 626 S.W.2d 485 (Tex.1981) alluded to the *Erspan* opinion without indicating approval or disapproval but merely stated that the holding was inapplicable to a case on direct appeal.

14. Both *Erspan, supra*, and *Wilson, supra*, represent opinions of the court anticipating Texas

law in light of *McCarty v. McCarty, supra*, in the absence of a Texas state court decision addressing the issue.

15. See for example *Trahan v. Trahan, supra; Ex parte Johnson, supra*.

justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,—with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified.

308 U.S., at 374, 60 S.Ct., at 318–319, 84 L.Ed., at 332–333.

▪▪▪ Among the factors or circumstances to which the courts have adverted in deciding whether and to what extent a judicially changed rule of law should be given retroactive operation are (1) the degree to which the prior rule may have been justifiably relied on, especially where matters of property or contract law are involved, (2) the degree to which the newly announced rule can be effectuated without being applied retroactively, and (3) the likelihood that retroactive operation of the overruling decision may substantially burden the administration of justice.[16] In determining to what extent, if any, an overruling decision is to be given retroactive effect, the crucial date is generally the date of the overruling decision. *Linkletter v. Walker, supra.*

▪▪▪ The obvious and substantial inequitable results that would derive from a retroactive application of *McCarty* have been documented by numerous courts.[17] Little would be gained by repeating them at length again. We agree with our brethen of the 3rd Court of Appeals and the 11th Court of Appeals in their recent opinions, *Ex parte Gaudion*, 628 S.W.2d 500 (Tex. App.—Austin, 1982) and *Ex parte Welch*, 633 S.W.2d 691 (Tex.App.—Eastland, 1982) respectively, holding that a retroactive application would affect the objectives of Congress only minimally, compared to the potentially destructive effect upon the settled jurisprudence of our State. In addition, the principles of res judicata and finality of judgments would become little more than historical fact, and the relatively settled areas of jurisdiction and family law would be rendered incomprehensible.

We can perceive no area of law requiring more stability and finality than family law. Public policy demands finality of litigation in this area to preserve surviving family structure. A retroactive application would reopen old wounds and rekindle animosities long since extinguished.[18] The results would be devastating to the litigants and to the judiciary in terms of expense, time and number of cases. In many instances it would be impossible for a court to arrive at a just and equitable redistribution of assets.

Considering the nature of preemption involved in *McCarty*, the law's concern in preventing uncertainty and confusion which could undermine the conclusive character of

---

**16.** In *Chevron Oil Company v. Huson, supra*, the court, in determining whether a decision will be denied retroactive application:
   (1) considers whether decision establishes new principle of law;
   (2) weighs merits and demerits in each case by looking to prior history of rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation;
   (3) and weighs any inequity imposed by retroactive application.

**17.** See note 2, infra, see especially dissenting opinion, *Ex parte Buckhanan, supra.*

**18.** In *Williams v. North Carolina*, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945) the court, in looking with disfavor upon the relitigating of issues long since settled with appropriate opportunity for the parties to be heard, stated:
   Divorce, like marriage, is of concern not merely to the immediate parties. It affects personal rights of the deepest significance. It also touches basic interests of society. 325 U.S., at 230, 65 S.Ct., at 1095, 89 L.Ed., at 1581–1582.

judgments, strong policy considerations for the preservation of stability in family law matters, together with the substantial burden on the administration of justice inherent in a retroactive application of *McCarty*, we decline to so apply it.

The holding in *Ex parte Buckhanan, supra*, is expressly disapproved, and the relator is remanded to the custody of the Sheriff of Bexar County.

ESQUIVEL, Justice, concurring.

Although I am in complete agreement with the majority, it is important to state specifically why *McCarty* does not apply in this case. It is evident that the trial court had jurisdiction of the subject matter and the parties in this case when it entered its original judgment of divorce. Since no direct attack upon the trial court's judgment was ever made, the decree of divorce became final. I agree that *McCarty* has rendered the decree of divorce erroneous, but I do not reach the conclusion of the majority in *Buckhanan* that McCarty rendered the decree of divorce *void ab initio*. Moreover, trial court judgments which, at the most, are erroneous, are entitled to sanctity of finality and must not be defeated by collateral attacks such as is present in the case at bar. Accordingly, I would expressly hold that *McCarty's* application be limited to those judgments which are not final and which are challenged on direct appeal.

I am compelled to present a further reason for denying relator's application for relief from the order of commitment.

The decree of divorce states that:

The Court finds that Chester B. Hovermale is a trustee for that portion of the retirement income award from the Navy retirement and that he shall provide payment by allotment to the wife Elizabeth M. Hovermale of her separate share of each monthly amount [38.37%] (including that percentage of any increased authorized by Congress); If an allotment is not possible, and only in that event, in alternative, the Court finds that Chester B. Hovermale shall hold each monthly payment in trust and he shall provide to Elizabeth M. Hovermale the amount above prescribed, with the first payment due and payable 1 July, 1979, and like payments due and payable on the first day of each month thereafter, based on the above formula.

Even though the facts of this case differ with the facts of *Ex parte Rodriguez*, 636 S.W.2d 844 (Tex.App.1981) with respect to the trust being created by agreement incident to divorce and subsequently being incorporated by reference in the *Rodriguez* divorce decree, the law which was applied in *Rodriguez* should be applied here as well.

It is undisputed that a trust was created by the trial court. Relator Hovermale was designated trustee under the terms of the trust and the respondent was designated the beneficiary. The trust res in issue on application for writ of habeas corpus was described as consisting of 38.37% of the total monthly military retirement retirement entitlements received by the relator.

The law is well-settled that legal title to the trust res is vested in the trustee. *McCamey v. Hollister Oil Co.*, 241 S.W. 689, 695 (Tex.Civ.App.—Fort Worth 1922), *aff'd on other grounds*, 115 Tex. 49, 274 S.W. 562 (1925); *Long v. Long*, 252 S.W.2d 235, 247 (Tex.Civ.App.—Texarkana 1952, writ ref'd n. r. e.); *See* Tex.Rev.Civ.Stat.Ann. art. 7425b–7(F) (Vernon 1960). As a result, the trial court has the power to hold relator Hovermale in contempt of court for refusing to obey an order directing him to pay to respondent funds which he holds as trustee and to which the respondent is legally entitled. *Ex parte Preston*, 162 Tex. 379, 384, 347 S.W.2d 938, 940–41 (1961); *See Ex parte Gorena*, 595 S.W.2d 841, 846–47 (Tex. 1979); *Ex parte Sutherland*, 526 S.W.2d 536, 539 (Tex.1975); and *Ex parte Anderson*, 541 S.W.2d 286, 288 (Tex.Civ.App.— San Antonio 1976, no writ).

Therefore, for these reasons, I would deny relator's writ and remand him to the custody of the sheriff.

CADENA, Chief Justice, dissenting.

The holding in *Ex parte Buckhanan*, 626 S.W.2d 65 (Tex.App.—San Antonio 1981, no writ), should be followed.

The position taken by the majority in this case rests entirely on the theory that the decision of the Supreme Court of Texas in *Ex parte Johnson*, 591 S.W.2d 453 (Tex. 1979), is not applicable to the facts of this case and of *Buckhanan.*

The attempted distinction between *Johnson*, on the one hand, and this case and *Buckhanan*, on the other, is based on what the majority opinion asserts is a distinction between the holdings in *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979), and *McCarty v. McCarty*, 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981). Justice Cantu's argument may be summarized as follows:

1. There is much confusion surrounding the term "preemption" because of the failure of the courts to recognize that there are different types of preemption.

2. The effect to be given a decision holding a state regulation invalid under the preemption doctrine depends on the type of preemption involved.

3. In *Hisquierdo*, the Supreme Court relied on two different types of preemption. Primary reliance was placed on the type of preemption which, according to the majority opinion, results when the federal statute in question requires, "by direct enactment, that state law be preempted and that the type of injury which the Supremacy Clause seeks to prevent was threatened by [the state law] in conflict with the [federal legislation]." The second type of preemption is said to occur when it is determined "that continued recognition of the assailed state interest threatened grave harm to clear and substantial federal interests."

4. *McCarty*, unlike *Hisquierdo*, is based solely on the second type of preemption.

All of the assumptions which are relied on for refusing to follow *Johnson* are in error.

There is no confusion surrounding the term "preemption." In *McCulloch v. Mary-*land, 4 Wheat 316, 436, 4 L.Ed. 579 (1819), Chief Justice Marshall made it clear that the "states have no power, by taxation or otherwise, to retard, impede, burden or in any manner control the operation of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." This conclusion, he said, is "the unavoidable consequence of that supremacy which the constitution itself has declared." *Id.* It is not necessary here to determine whether *McCulloch* may properly be classified as a preemption case. The doctrine of preemption rests on the Supremacy Clause and Marshall's words leave no doubt concerning the effect of such clause on state regulations which, if given effect, would "retard, impede, burden, or in any manner control, the operation of the constitutional laws enacted by Congress."

Insofar as resolution of the problem now before us is concerned, preemption occurs when the state regulation obstructs "the accomplishment and execution of the full purposes and objectives of an Act of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). A state regulation will be held to be in such unconstitutionally obstructive position when the federal legislation is found to evidence a congressional intent to occupy the whole field or when there is a substantial conflict between the federal and state regulations. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141, 83 S.Ct. 1210, 1216, 10 L.Ed.2d 248 (1963).

It is true that the Supreme Court often speaks in terms of federal legislation having the effect of "overriding" or "superseding" state law, and when the Court finds the preemption doctrine applicable it frequently declares that the challenged state regulation must "give way" and "become inoperative." The choice of different terms to describe the effect of preemption, however, does not establish that there are different types of preemption. In all cases where the doctrine is found to be applicable the result is the invalidation of state law under the Supremacy Clause because of the incompatibility of state law with the feder-

al regulatory scheme. If state law is invalidated, it is certainly overriden and superseded and must give way and become inoperative.

The majority's statement, "In the final analysis, it seems clear that the term 'preemption' does not always imply a prohibition and, therefore, a withholding of jurisdiction to act", is nothing more than a contradiction in terms. The conclusion that congressional action has preempted an area always carries with it the consequential prevention of future state regulation in that area or the suspension of existing state regulation in such area.

After determining that there are different types of preemption, some of which apparently do not preempt, the majority opinion proceeds to distinguish *Hisquierdo* and *McCarty* on the basis of the type of preemption involved in each case. This distinction is crucial to the ultimate conclusion that *Ex parte Johnson* is not controlling here. Of course, if the conclusion that there are several types of preemption is incorrect, the attempted distinction must fail. Even if it be assumed that there are different types of preemption, the distinction must fail.

Justice Cantu correctly asserts that *Hisquierdo* describes the determinative test to be "whether the right as asserted conflicts with the express terms of federal law *and* whether its consequences sufficiently injure the objectives of the federal program to require non-recognition." 439 U.S. at 583, 99 S.Ct. at 809. This is precisely the test applied in *McCarty*. The *McCarty* opinion, after quoting the very language relied on by Justice Cantu, states, "It is to this twofold inquiry that we now turn." 453 U.S. at 220, 101 S.Ct. at 2735.

Although *McCarty* expressly adopts and applies the same test applied in *Hisquierdo*, the majority opinion insists that the two cases are distinguishable because *McCarty*, unlike *Hisquierdo*, concluded that "a mere conflict" between federal and state law is insufficient to invoke preemption, particularly "where the conflict is only one of words." According to Justice Cantu, be-

cause of the *McCarty* conclusion that mere conflict in words is insufficient, "reliance was then had upon the second type of preemption ... to determine that continued recognition of the assailed state interest threatened grave harm to clear and substantial federal interests." The *McCarty* opinion does, indeed, state that a "mere conflict in words is not sufficient." 453 U.S. at 232, 101 S.Ct. at 2741. In *Hisquierdo* the Court said, "a mere conflict in words is not sufficient." 439 U.S. at 581, 99 S.Ct. at 808. The recognition that mere conflict is insufficient, then makes *McCarty* like, rather than unlike, *Hisquierdo*. The *McCarty* language was lifted word for word from, and expressly attributed to, *Hisquierdo*. *McCarty*, 453 U.S. at 232, 101 S.Ct. at 2741.

It is also true that *McCarty*, after following the *Hisquierdo* conclusion that mere conflict is insufficient, required a finding that continued recognition of the state interest threatened grave harm to clear and substantial federal interests. In requiring such a finding, *McCarty* again, was merely following *Hisquierdo*. The *Hisquierdo* opinion, after noting that mere conflict is not sufficient, described the additional requirement as follows: "State family and property law must do 'major damage' to 'clear and substantial' federal interests before the Supremacy Clause will demand that state law be overriden." 439 U.S. at 581, 99 S.Ct. at 808. The test applied in *Hisquierdo* clearly requires both "conflict" and a finding that the consequences of the asserted state interest "sufficiently injure the objectives of the federal program ..." 439 U.S. at 583, 99 S.Ct. at 809. This language was quoted, and relied on, in *McCarty*, 453 U.S. at 232, 101 S.Ct. at 2741. If both cases required conflict *and* an injury to federal interests, how can the majority opinion say that the two cases did not rely on the same type of preemption?

The majority opinion also speaks of a preemption which results "from prohibition of Congress" and a preemption which "occurs by virtue of decisional law and statutory construction." Apparently, the theory is

that the preemption resulting from the *Hisquierdo* opinion did not occur by virtue of decisional law and statutory construction, but that the *McCarty* preemption did. Justice Cantu stresses that *Hisquierdo* noted that the language of the Railroad Retirement Act "positively required, by direct enactment, that the type of injury the Supremacy Clause seeks to prevent was threatened by community property interests in conflict with the Act." Apparently, this observation is thought to compel the conclusion that the preemption in *Hisquierdo* resulted "from prohibition of Congress" and not from "decisional law and statutory construction."

Presumably, the statement that the Railroad Retirement Act positively required that state community property laws be preempted refers to that portion of the Act which places retirement benefits payable under that Act beyond the reach of legal process. 45 U.S.C. § 231m. It can hardly be seriously contended that the language of § 231m "positively" requires that state community property laws be preempted. The statement in § 231 that benefits paid under the Act shall not be subject to garnishment is a singularly inept way of asserting that state community property laws must be preempted. As Mr. Justice Stewart pointed out in his dissenting opinion in *Hisquierdo*, § 231m does not "speak to substantive ownership interests that may or may not exist in annuities or pension payments," and "seems to have been designed to protect the benefits from the reach of creditors." 439 U.S. at 598–99, 99 S.Ct. at 816–17. Terms such as "garnishment" and "attachment" "govern remedies, not ownership rights, and the remedies themselves traditionally have been unavailable in an action grounded upon the theory that the property at issue 'belongs' to the claimant." 439 U.S. at 599, 99 S.Ct. at 817.

It is clear that the "overriding" of state law in *Hisquierdo* resulted from "decisional law and statutory construction," since the conclusion that a provision immunizing benefits from garnishment and attachment "positively" prohibits the enforcement of state law recognizing a joint ownership of

the benefits can only be arrived at by resorting to the process normally called statutory construction. Stated differently, an exemption from legal process cannot be transformed into an invalidation of state community property laws except by statutory construction.

It may be argued that the Railroad Retirement Act positively required preemption of state community property laws because the *Hisquierdo* opinion relied solely on that Act and disregarded all other federal legislation. This argument, however, is simply false. For example, the *Hisquierdo* opinion expressly refers to the Social Security Act 45 U.S.C. § 501, *et seq.*, and notes that in adopting § 462 of that Act, Congress expressed the intention that a family's "need for support could justify garnishment [of retirement benefits], even though it deflected other federal benefits from their intended goals, but that community property claims, which are not based on need, could not do so." 439 U.S. at 587, 99 S.Ct. at 811.

The Eastland Court of Appeals declined to follow *Ex parte Johnson* in a case involving nondisability military retirement benefits, using the same reasoning as that relied on by the majority here. *Ex parte Welch*, 633 S.W.2d 691 (Tex.App.—Eastland, 1982) (not yet reported). The Eastland Court argued that Congress had not positively required by direct enactment that state community property laws be preempted as to nondisability military retirement benefits. Both the majority opinion here and the *Welch* opinion gratuitously and erroneously assume that the positive requirement of preemption by "direct enactment" must be found in the very statute which establishes the retirement system. As already pointed out, *Hisquierdo* did not rely solely on the Railroad Retirement Act; it referred to the Social Security Act at least twice. 439 U.S. at 576, 578, 99 S.Ct. at 805, 806. The test applied in *Hisquierdo* is phrased in terms of conflict with "federal law" and injury to the objectives of a "federal program."

The federal program which was protected against injury in *McCarty* is the military retirement program which is designed to provide for the retired service member and to meet the personnel management needs of the active military forces. *McCarty*, 453 U.S. 232, 101 S.Ct. at 2741. Certainly, all federal law regulating such program and designed to achieve the program's objectives must be considered to be the "federal law" against which the validity of the challenged state regulation must be tested.

If the *Hisquierdo* decision is based on the fact that federal law placed Railroad Retirement Act Benefits beyond the reach of legal process, there is a "federal law" which has the same effect as to nondisability military retirement benefits. Section 659(a) of the Social Security Act (42 U.S.C. § 659(a)) provides as follows:

> ... moneys (the entitlement to which is based upon renumeration for employment) due from, or payable by, the United States ... to any individual, including members of the armed services, shall be subject, in like manner and to the same extent as if the United States ... were a private person, to legal process brought for the enforcement, against such individual of his legal obligation to pay child support or make alimony payments.

42 U.S.C. § 659(a).

Section 662 of the Social Security Act makes it clear that the term "alimony" as used in Sec. 659(a) "does not include any payment or transfer of property ... in compliance with any community property settlement, equitable distribution of property, or other division of property between spouses or former spouses." 42 U.S.C. § 662(c). Section 662(c) also makes it clear that Sec. 659(a) applies to military retirement benefits. 42 U.S.C. § 662(f)(2). *Hisquierdo* recognized that the above provisions of the Social Security Act "expressly override" the anti-assignment provision of the Railroad Retirement Act. 42 U.S.C. § 231m. Through the above provisions of the Social Security Act, Congress facilitated the enforcement of claims based on spousal support but declined to do so "for community property claims." *Hisquierdo*, 439 U.S. at 587, 99 S.Ct. at 811. If Sec. 231m of the Railroad Retirement Act, which does not mention community property law, is a positive requirement by direct enactment that state community property law be preempted, then the provisions of the Social Security Act which expressly prohibit the use of legal process to enforce community property claims, are, at the very least, as clearly a positive requirement by direct statutory enactment that state community property law be preempted.

The Social Security Act clearly and unmistakably provides that military retirement pay shall be subject to legal process "brought for the enforcement" of the retiree's "legal obligations to provide child support or make alimony payments", but not for the purpose of enforcing compliance "with any community property settlement, equitable distribution of property, or other division of property between spouses or former spouses." 42 U.S.C. §§ 659(a), 662(c) and 662(f)(2). There can be no doubt that such sections of the Social Security Act are a part of the "federal law" establishing retirement benefits for railroad employees. Clearly, such sections of the Social Security Act must be considered a part of the "federal law" governing the federal military retirement "program" which state law cannot validly obstruct. The *McCarty* references to the Retired Serviceman's Family Protection Plan, 10 U.S.C. §§ 1431–1446, 1976 ed., Supp. III, and the Survivor Benefit Plan, 10 U.S.C. §§ 1447–1455, 1976 ed., Supp. III, are references to "federal law" regulating the program which must be protected against obstruction by state law.

The Supreme Court, in *Ridgway v. Ridgway*, 454 U.S. 46, 102 S.Ct. 49, 54–55, 70 L.Ed.2d 39 (1981), pointed out that *Hisquierdo* and *McCarty* followed the same approach in determining that state community property law was unacceptably obstructive of the program established by federal law. Since *McCarty* applied precisely the same test as did *Hisquierdo*, the majority's conclusion that *Hisquierdo* and *McCarty* are somehow different must be rejected.

Additionally, the suggested distinction between Railroad Retirement Act benefits and military retirement benefits does not exist.

*Ex parte Johnson*, 591 S.W.2d 453 (Tex. 1979), clearly held that when a state court's power to treat disability retirement benefits as community property has been preempted by federal legislation, a final state court decision purporting to divide such benefits cannot be given res judicata effect and the order of division cannot be enforced by contempt proceedings.[1] The argument that the preemption found in *Johnson* somehow differs from the preemption found in *McCarty* cannot be accepted. The *Johnson* decision, like the *McCarty* decision, is based squarely on *Hisquierdo*. The Texas court relied on statutory language relative to the rights of the veteran's dependents and on language similar to that found in the Social Security Act declaring the payments immune from legal process. *Ex parte Johnson*, 591 S.W.2d at 455.

*Johnson* shows that the majority's reliance on the doctrine of res judicata is misplaced. According to the majority theory, the prior divorce decree in *Johnson* would be immune from collateral attack, since the "defense" of federal preemption could have been raised in the divorce trial. It is generally true that an erroneous conclusion reached by a court and embodied in a final judgment does not prohibit a party in a subsequent action from relying on the plea of res judicata. It is also true that a judgment "merely voidable because based upon an erroneous view of the law is not open to collateral attack."

What happened in *Johnson*? At a time when the preemptive effect of federal law had not been judicially declared concerning military disability retirement benefits, a Texas court entered a judgment disposing of such benefits as community assets. This judgment was not appealed and, therefore, became a final judgment. If the judgment were merely "erroneous", it was beyond attack. But, when the ex-spouse sought to enforce the previous judgment, the highest tribunal in Texas declared that enforcement was impossible because the federal law had preempted the Texas rules of marital property rights. *Johnson* unequivocally permitted a collateral attack on the prior final judgment of a Texas court. Stated bluntly, *Johnson* necessarily holds that a prior divorce decree rendered by a Texas court that treats as community property, benefits, that cannot be subjected to the state's community property rules under federal law, is void insofar as the decree purports to divide the benefits or to treat them as community property. *See also Ex parte Burson*, 615 S.W.2d 192 (Tex.1981).

In *Kalb v. Feuerstein*, 308 U.S. 433, 438–39, 60 S.Ct. 343, 345–346, 84 L.Ed. 370 (1940), the Supreme Court held that judicial action taken with respect to the person or property of a debtor, who is protected by the bankruptcy law, is a nullity and vulnerable to collateral attack, despite the general principle that a court judgment bears a presumption of regularity and is not thereafter subject to collateral attack. Justice Cantu brushes *Kalb* aside with the comment that it involved some peculiar type of preemption which results when Congress acts in an area concerning which it has plenary power. This purported distinction is of no avail here because there can be little doubt that Congress has the plenary and exclusive power to determine the compensation which will be paid to members of the armed forces.

Here, as in *Kalb*, Congress, acting in an area over which it has plenary and exclusive power, has protected military retirement pay benefits from the reaches of the

---

1. *See also In re Cobble*, 592 S.W.2d 46 (Tex. Civ.App.—Tyler 1980, writ dism'd). *Cobble* closely resembles the case before us in that the trial court acted without the power to do so. The Tyler Court of Appeals held that a portion of a divorce decree incorporating the agreement of the parties concerning child support was enforceable by contempt only to the extent that the support provisions of the decree were authorized by the statute providing for child support. *Cobble* stands for the proposition that a portion of a divorce decree which goes beyond that which the court is authorized by law to order cannot be enforced by contempt. 592 S.W.2d at 49.

state judicial power. As in *Kalb*, a state court, disregarding the Congressional mantle of protection, has attempted to subject such property to the state rules regulating marital property rights. Why should not the state court's unconstitutionally obstructive action be as vulnerable to collateral attack as such action was held to be in *Kalb*?

In *Hoffman v. United States*, 391 F.2d 195 (9th Cir. 1968), a state court divorce decree ordered the husband to keep his ex-spouse as beneficiary on his government life insurance policy. On August 23, 1963, the husband changed the beneficiary and, after his death in 1964, the former wife sought to recover the insurance money. According to the court, the question before it was: "Does a state court have the power to effectively require an unwilling veteran to maintain his former wife as beneficiary on his National Service Life Insurance Policy?" *Hoffman*, 391 F.2d at 196. In holding that the state court lacked such power, the court said that the state divorce decree "nullifies the soldier's choice and frustrates the deliberate purpose of Congress" and that, therefore, the divorce decree "cannot stand." *Id.* *Hoffman* refused to accord any effect to the prior final state court divorce decree.

The last relevant pronouncement by the Supreme Court on the question of federal preemption of state community property law appears to be *Ridgway v. Ridgway*, 454 U.S. 46, 102 S.Ct. 49, 70 L.Ed.2d 39 (1981), which involved an attempt by a state court to embody in a divorce decree a provision requiring the serviceman to keep his children beneficiaries of his service life insurance policy. When the serviceman subsequently remarried, he ignored the state court's order and changed the beneficiary. After his death, the first wife sought to recover the proceeds of the policy for the benefit of the children. This effort failed.

Pointing out that applicable federal law gave the serviceman the absolute right to designate beneficiaries, the Supreme Court said:

> The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the framers of our constitution provided that the federal law must prevail.... And, specifically, a state divorce decree, like other law governing the economic aspects of domestic relations, must give way to clearly conflicting enactments [citing *McCarty* and *Hisquierdo*].

*Ridgway*, 454 U.S. at 55, 102 S.Ct. at 54. Whatever construction one desires to place on *Ridgway*, it is clear that the Supreme Court in that case refused to give anything resembling res judicata effect to the previous final state court divorce decree.

What we have in this case is simply an instance in which the state court lacked power to divest the serviceman of his interest in the retirement benefits because of federal legislation. As Chief Justice Marshall said in *McCulloch v. Maryland, supra*, we simply are faced with a situation in which the "States have no power ... to retard, impede, burden or in any manner control, the operation of the constitutional laws enacted by Congress ..." Absent such power, the attempt by Texas courts to impede the operation of the federal laws governing the retirement program must be considered a nullity and subject to collateral attack.

Justice Esquivel's reliance upon Texas trust law, as was done in *Ex parte Rodriguez*, 636 S.W.2d 844 (Tex.App.1981), is wholly insupportable. If the trial court has jurisdiction over military retirement pay, it is not essential to make the retiree a trustee in order to enforce the court's division of community property. If retired pay is not community property and the trial court has no jurisdiction to divide it, the trial court may not gain jurisdiction over the retired pay by the simple expedient of calling it a trust res. The trust theory is a strained effort to divest the retired person of a beneficial interest in his retired pay, contrary to the intent of Congress. This "back door" approach to the problem was categorically rejected in *Ridgway*, and we reject it here.

There remains only what might be called the "policy" argument advanced by Justice

Klingeman in his dissenting opinion in *Buckhanan.* This argument seems to rest on the assumption that if the Texas courts had realized that retirement benefits could not be treated as community property, past divorce decrees would have ordered a different division of the admitted community assets. That is, the need to award the entire retirement benefits to the serviceman would have been "offset" by awarding additional community property to the other spouse. *See Ex parte Buckhanan,* 626 S.W.2d at 69.

This approach has one serious flaw. It overlooks entirely the language in *Hisquierdo* which recognizes that "an offsetting award ... would upset the statutory balance and impair petitioner's economic security just as surely as would a regular deduction from the benefit check," and that the harm resulting from such an offsetting award "might well be greater." 439 U.S. at 588–89, 99 S.Ct. at 811–812.

We cannot, in good conscience, accept the argument that because former spouses have in the past been the recipients of awards that state courts had no power to make, such impermissible awards must be allowed to continue. No matter how appealing the "policy" argument may be, it nonetheless would have us disregard express holdings of the United States Supreme Court and the Supreme Court of Texas. We simply are not at liberty to do so.